STEPHEN B. SCALLEN and CHACKE Y. SCALLEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scallen v. Commissioner
Docket No. 6913-85.
United States Tax Court
T.C. Memo 1987-412; 1987 Tax Ct. Memo LEXIS 409; 54 T.C.M. (CCH) 177; T.C.M. (RIA) 87412; August 24, 1987; As Amended November 3, 1987; See Attached Order Amending This Opinion James W. Littlefield, for the petitioners. Genelle E. Forsberg and Gordon Gidlund, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651(a)
6653(a)(1)
6653(a)(2)
[1]6653(b)
1976
$ 17,716
-
-
-
$ 8,858
1977
391,204
-
-
-
195,602
1978
6,607
-
-
-
3,304
1979
277,140
$ 41,571
$ 13,875
-
-
1980
97,922
-
4,896
-
-
1981
442,840
-
22,142
*
-
*415 In his Answer, respondent further claims the following additions to tax: Additions to Tax
Year
Sec. 6653(b)
Sec. 6653 (b)(2)
1979
$ 138,570
-
1980
48,961
-
1981
221,420
*
Respondent asserts the additions to tax fraud only against Stephen B. Scallen (petitioner), not petitioner's wife, Chacke Y. Scallen. If the court determines that petitioner owes no additions to tax for fraud under section 6653(b), respondent, in his Answer, requests the Court (1) to make a determination, pursuant to section 6214(a), of additions to tax under section 6653(a) for 1976, 1977, and 1978 and (2) to sustain the additions to tax claimed by respondent in his notice of deficiency for 1979, 1980, and 1981. Although respondent identified 44 issues in his trial memorandum and in his opening brief, petitioners have addressed *416 only 23 of them. Because petitioners failed to articulate arguments on the other issues, all of which were essentially factual issues on which they bear the burden of proof under Rule 142(a), we conclude that they have abandoned and thereby conceded those issues. See Calcutt v. Commissioner,84 T.C. 716 (1985). [2] Respondent's determinations as to those issues, unless otherwise modified by the stipulation of the parties, are therefore sustained. *417 Our findings of fact and opinion have been organized so that related issues may be considered together. A table in the attached Appendix will assist the parties to cross-reference the issues herein to the issues laid out in their respective briefs. The issues remaining for decision are as follows: (1) Whether petitioner's gain realized on the retirement of the Eberhardt Company note in 1977 is capital gain or ordinary income. (2) Whether petitioner realized ordinary income in 1977 of $ 70,577 representing John C. Parrott, M.D.'s (Dr. Parrott), distributive share on liquidation of Franklin Park Partnership's assets. (3) Whether petitioner correctly reported gain in 1979 on the sale of the Mark Twain Hotel/Brittany Apartments (Brittany). (4) The amount of gain realized on the sale of Brittany to Charger Jet in 1980. (5) Whether petitioner is entitled to a capital loss in 1981 attributable to the sale of Brittany to Charter Jet in 1980. (6) Whether petitioner is entitled to deduct $ 18,503 in 1980 as repairs expenses relating to certain property at 1313 Como, S.E. (1313 Como). (7) Whether petitioner's 1981 transfer of 1313 Como to Interfund Services, Inc. (Interfund, *418 Inc.), was a sale or a contribution to capital. (8) Whether petitioner had income in 1981 when Interfund, Inc., transferred the remaining condominium units to Campus Corporation. (9) Whether petitioner is entitled to an interest deduction in 1979, of $ 46,783 attributable to the settlement of a lawsuit by Midway National Bank of St. Paul. (10) Whether petitioner is entitled to deduct $ 30,000 in 1980 for a lawsuit settlement involving Campus Realty Company No. 12 partnership. (11) Whether petitioner is entitled to deduct $ 58,500 in 1980 for a lawsuit settlement involving Frank Klodt & Sons, Inc.
(12) Whether petitioner is entitled to deduct legal fees in 1979. (13) Whether petitioner is entitled to deduct legal fees in 1980. (14) Whether petitioner is entitled to deduct $ 5,000 for "Legal and professional services" and $ 22,000 for "Promotion" for amounts allegedly paid to Gerald R. Hansen (Hansen) in 1978. (15) Whether petitioner is entitled to capitalize the "Consulting Fees" of $ 37,198 allegedly paid to Hansen in 1978. (16) Whether petitioner is entitled to deduct $ 25,000 for "Commissions" allegedly paid to Hansen in 1979. (17) Whether petitioner is *419 entitled to deduct $ 25,000 for "Consulting Fees" allegedly paid to Hansen in 1980. (18) Whether petitioner is entitled to deduct $10,000 for "Commissions" allegedly paid to Hansen in 1980. (19) Whether petitioner had income in 1980 from the forgiveness of liabilities. (20) Whether petitioner had income in 1981 from the forgiveness of liabilities. (21) Whether petitioner had additional income in 1981 from teaching at the University of Lyon in France. (22) Whether petitioner is entitled to deduct losses in 1979 and 1980 attributable to Sunnyside Development Corporation, a small business corporation. (23) Whether petitioner is liable for additions to tax for fraud under section 6653(b) in each of the years 1976, 1977, 1978, 1979, 1980, and 1981. (24) If we do not find fraud in each year in issue, whether petitioner is liable for additions to tax under sections 6651(a) and 6653(a). FINDINGS OF FACT Petitioners Stephen B. Scallen and Chacke Y. Scallen, husband and wife, resided in Minneapolis, Minnesota, when they filed their petition. They filed joint Federal income tax returns for each of the years 1971 through 1983. On each return, petitioners reported a *420 tax liability of zero. Petitioner's Background
Petitioner graduated from the University of Minnesota Law School in 1959, ranking third or fourth in his class of about 70. He was president of the law review and a member of the Order of the Coif. From 1959 to 1961, petitioner was an associate in a large, prestigious law firm based in Washington, D.C., where he concentrated in the field of Federal income taxation. From 1961 until 1965, petitioner served as assistant dean of the University of Minnesota law school. From 1961 through the time of trial, petitioner was a professor at the University of Minnesota law school, teaching courses in Federal income taxation, business planning, securities regulations, real estate planning, international law, and international taxation. From 1976 through 1983, petitioner attended various continuing legal education courses, including, among other things, Usury Law and Modern Business Transactions, Tax Shelters, Housing Law, Estate Planning, International Tax Problems, and Purchase and Broker Agreements. In 1980, petitioner taught two continuing legal education courses: "Real Estate Planning: Purchase Agreements" and "Real Estate Planning: *421 Tax Free Exchanges." On a leave of absence from the University of Minnesota during the 1965 and 1966, petitioner was a Graduate Fellow at Harvard Law School where he researched and studied Federal taxation. Petitioner wrote two articles for the Minnesota Law Review entitled "Federal Income Taxation of Professional Associates and Corporations" (in March 1965) and "Deductibility of Anti-Trust Treble Damage Payments" (in June 1968) and one article for the 1970 Institute on Estate Planning entitles "The Professional Association." Petitioner's Real Estate Activities
Beginning in 1966, petitioner engaged in the real estate business in Minneapolis, Minnesota, in addition to teaching at the University of Minnesota. His activities included the buying and selling of real estate, the development of apartment complexes and condominiums, syndication and management of real estate partnerships, the arranging of real estate financing, and the management of real estate rental properties. Between 1974 and 1978, petitioner owned, controlled, or held an interest in approximately 19 petitioner owned, controlled, or held and interest in approximately 19 partnership, 6 corporations, and 11 ventures *422 classified as sole proprietorships, all of which were related to real estate ventures or properties. Among the partnerships were the following: Petitioner's Percentage
Name
of Ownership
Monroe House Partnership
50%
(as of 1/1/76)
Franklin Park Partnership
60%
(as of 1/1/76)
Campus Development, Ltd.
40%
Partnership  Cedar Courts, Ltd. Partnership
-- *
Campus Realty Company No. 4
-- *
Partnership (CR-4)  Campus Realty Company No. 5
-- *
Partnership (CR-5)  Campus Realty Company No. 12
-- *
Partnership (CR-12)  Some of these partnerships constructed apartment buildings, and all of them operated buildings. Petitioner was the managing general partner in each of the partnerships, and he directed the preparation of partnership *423 returns for most, if not all, of the partnerships. The six corporations with which petitioner was affiliated were Interfund Services, Inc. (Interfund, Inc.), Sunnyside Development Corporation (Sunnyside, Inc.), Chesapeake Development Corporation (Chesapeake, Inc.), Jansco, Inc., Blue Ridge Properties Corporation (Blue Ridge, Inc.) and Campus Realty Corporation (Campus Realty, Inc.). Petitioner was the sole shareholder and corporate officer of Interfund, Inc., Sunnyside, Inc., and Campus Realty, Inc. Interfund, Inc., and Jansco, Inc., were electing small business companies during the years in issue and Sunnyside, Inc., was an electing small business company beginning in 1979. Beginning around 1970, Donald J. Hamm (Hamm), a certified public accountant beginning in 1972, prepared tax returns for petitioner and his various entities. With respect to petitioners' personal tax returns, petitioner generally supplied Ham with information in the form of itemized lists. When Hamm had completed the personal and business returns, he would submit them to petitioner for his signature. Hamm also prepared certain adjusting journal entries challenged by respondent. The entries were usually *424 made pursuant to instructions by petitioner. Hamm often requested that petitioner provide documentation, but petitioner rarely did so. Beginning in 1971, Betty Zweig was employed as petitioner's secretary and office manager. From July 1972 through February 1981, Donna Wachtler performed bookkeeping services for petitioner's real estate business. During the years 1971, 1972, and 1973, petitioner's real estate management business was conducted by Interfund, Inc. Beginning in 1974, petitioner used the name Interfund Services for his property management business. Beginning in 1975, petitioner conducted his property management business as a sole proprietorship under the name of Jansco. [3] Petitioner reported items of income and expense relating to his property management business on Schedule C of his tax returns. Although petitioner otherwise reported items of income and expense on the cash basis, all items on Schedule C were reported on the accrual basis. *425 Separate ledger accounts were kept for each property in which petitioner held an interest, either individually, through a partnership, or through a corporation. These separate ledgers did not have a cash ledger account. Instead, petitioner's property management business was the "cash hub" for all the related partnerships and entities; it managed all cash receipts and disbursements attributable to the various entities. Intercompany accounts were maintained, and adjusting journal entries described the transactions. For example, when Interfund/Jansco collected rents on behalf of Monroe House, the following entries were made in their respective books: Interfund/Jansco
Cash
$ 30,000
Due to/from Monroe House     $ 30,000
Monroe House
Due to/from Interfund/Jansco
$ 30,000
Rental Income     $ 30,000
I. Franklin Park Partnership
On March 31, 1972, Franklin Park Apartments, Ltd. (the Franklin Park Partnership) was formed to own, manage, and operate an apartment building on East Franklin Avenue. Petitioner was the general partner, and the limited partners included Campus Developments, Ltd., John C. Parrott, M.D. (Dr. *426 Parrott), Harold Roitenberg, and Leonard LaBelle. All limited partners contributed cash, except Campus Developments, Ltd., whose contribution was fee title to the Franklin Park Apartments subject to certain liabilities.
A. The Eberhardt Company Note
The property contributed by Campus Developments, Ltd., was subject to a $ 400,000 liability to the Eberhardt Company incurred on or about June 7, 1971. Specifically, Frantz Klodt & Son, Inc. (FKSI) and Franklin Park Towers Corporation (FPTC), a company in which petitioner was the sole shareholder, had executed and delivered to Eberhardt Company (Eberhardt) a Principal Note for $ 400,000 (the Eberhardt note), a Mortgage Deed, and certain other instruments identifying the property on East Franklin Avenue as collateral. On December 9, 1974, a Settlement Agreement was executed as a result of various defaults claimed by Eberhardt, including the nonpayment of principal and interest due in total amounts of $ 400,000 and $ 34,250.32 at December 1, 1974, respectively. Pursuant to the Settlement Agreement, petitioner, d/b/a Interfund/Jansco, acquired Eberhardt's interest in the $ 400,000 note. In exchange, Eberhardt received, among *427 other things, "fee title to or vendee's interest in" six parcels of property, the accumulated equity value of which the parties agreed was $ 179,600. On its books for 1974, Interfund/Jansco recorded the acquisition of Eberhardt's interest in the $ 400,000 Note in the following adjusting journal entries (AJE): AJE - 13
Debit
Credit
Contract for Deed Receivable --
Franklin Park
$ 179,600
Due to Campus Realty 1     $ 25,000
Due to Campus Realty 2     55,000
Due to Campus Realty 3     58,000
Due to Campus Realty 8     16,300
Due to Campus Realty 9     15,300
Due to Selby (Avenue)     10,000
AJE - 36
Contract for Deed Receivable --
Franklin Park
$ 220,400
Discount on Contract for Deed     $ 220,400
Interfund/Jansco continued to record the promissory note due from Franklin Park Partnership as a Contract for Deed Receivable until 1977. In 1977, Franklin Park Partnership's property was sold under foreclosure by Mutual Benefit Life Insurance Company (Mutual Benefit), the holder of the first mortgage, and the partnership was terminated. [4] On its balance sheet for *428 1977, Franklin Park Partnership listed assets of $ 845,866 attributable to accounts receivable from Interfund/Jansco and liabilities of $ 493,000 to Interfund/Jansco. The liabilities consisted of the $ 400,000 liability to petitioner on the Eberhardt note and $ 93,000 of accrued interest expense on the note. To close certain accounts with the terminated partnership, Interfund/Jansco recorded the following adjusting journal entry on its books for 1977: Due to Franklin Park
$ 845,886.13
Due to CR-11     $ 169,177.22
C/D Franklin Park     400,000.00
C/D Rec. Discount
220,400.00
Income     497,108.91
Due from Scallen     -
*429 In respondent's notice of deficiency, he determined that petitioner's Schedule C gross receipts for 1977 should be increased by $ 220,400 representing "gain on the payoff at face of the discounted Eberhardt mortgage."
B. Dr. Parrott's Share of Liquidated Assets
The Franklin Park Partnership Agreement provided that: XI LIQUIDATION
In the event of the dissolution of the partnership, the partnership shall be liquidated promptly and the proceeds thereof applied and distributed in the following order of priority: A. To the payment of the debts, liabilities and obligations (other than any loans or advances that may have been made by the partners to the partnership) of the partnership and to the costs and expenses of the liquidation; B. To the establishment of such reserves, if any, deemed reasonably necessary for any contingent or unforeseen debts, liabilities, or obligations of the partnership; C. To the repayment of any advances that may have been made by the General Partner to the partnership; D. To the repayment of the original capital contributions to the partnership, except for the Campus Developments' contribution; E. To the repayment of the *430 original capital contribution by Campus Developments. The balance remaining after the repayment of the original capital contributions to the partnership shall be distributed as follows: one-sixth to the General Partner and five-sixths to the Limited Partners, in the same proportions as their respective contributions to capital. In 1977, the year in which the Franklin Park Partnership was terminated, the ownership of Franklin Park Partnership was as follows: petitioner - 60 percent, Campus Development Ltd. - 20 percent, and Dr. Parrott - 20 percent. Through the time of trial in 1986, Dr. Parrott had not received any distribution from the partnership's liquidation. In respondent's notice of deficiency, he determined that petitioner's Schedule C gross receipts for 1977 should be increased by $ 70,557, representing Dr. Parrott's share of the assets of Franklin Park Partnership retained by petitioner when the partnership was liquidated. II. Mark Twain Hotel/Brittany Apartments
On June 29, 1977, petitioner entered into a Purchase Agreement with Henry W. Haverstock, Jr., for the purchase of a 114-unit apartment/hotel known as the Mark Twain Hotel/Brittany Apartments (Brittany). *431 The purchase agreement provided that petitioner would pay $ 10,000 in cash on December 31, 1977, assume a first mortgage of approximately $ 720,000, assume a note to Guaranty State Bank of not greater than $ 26,000, assume a promissory note to Gerald R. Hansen (Hansen) of $ 2,500 due August 1, 1977, assume and pay all outstanding bills of not greater than $ 15,000, assume an agreement to pay Hansen an amount not greater than $ 90,000, and pay a note to National City Bank of $ 6,000. In March 1978, petitioner refinanced Brittany and received a loan of $ 800,000 from Midwest Federal Savings and Loan Association of Minneapolis (Midwest). The note was executed by petitioner as president of Blue Ridge, Inc., with petitioner personally guaranteeing payment of the note. Out of the proceeds of this loan, Hansen was paid $ 67,000.
A. 1979 Transactions
On January 31, 1979, Blue Ridge, Inc., sold Brittany to Hansen (the January contract). The purchase price was $ 1,700,000, including cash of $ 172,300 and a contract for deed of $ 1,527,700 to be paid in monthly installments. Any outstanding balance was due and payable on February 1, 1988. Hansen could prepay without penalty; *432 he assumed no personal liability under the contract; and he was required "to pay 9/12 of the real estate taxes due and payable in the year 1979." The total amount of real estate taxes paid in 1979 was $ 53,200. On February 1, 1979, the next day, Hansen sold Brittany to Bradley A. Herman (Herman). The purchase price was $ 1,706,700, including $ 10,000 of cash, $ 169,000 to be paid in monthly installments of $ 5,000, and $ 1,527,700 to be paid by assumption and payment of the monthly installments due Blue Ridge, Inc., pursuant to the January contract. Herman encountered financial problems in operating the property. On November 19, 1979, Herman entered into an agreement with Campus Realty, Inc., and petitioner (the November contract). Herman agreed to transfer by quitclaim deed all of his right, title, and interest in Brittany to Campus Realty, Inc. Herman further agreed to continue to make all "payments" through December 1, 1979, and to make certain improvements and repairs. Petitioner and Campus Realty, Inc., agreed to transfer to Herman their right, title, and interest in three properties, including CR-4 property (being sold on contract for deed), CR-10 property (being sold *433 on contract for deed), and property located at 1714 Thomas Place. Petitioner and Campus Realty, Inc., represented that the total contract equity in these properties was $ 311,000 as of December 1, 1979. On Schedule D of petitioner's 1979 tax return, petitioner reported a long-term capital gain of $ 172,300 for "Gain on Reacquisition of Real Estate sold 2/1/79, reacquired 12/1/79, purchased originally 10/1/77." Hamm's work papers show the amount of cash received, $ 172,300, and the following computation of gain: Selling Price
$ 1,700,000
Commission
122,740
Repairs
25,000
Adjusted Basis
979,329
Gain on Sale
$ 572,931
On schedule E of petitioner's 1979 tax return, he reported several items identified as "Installment Sales" and that included computations of gain from gross profit percentages. In his notice of deficiency, respondent determined that petitioner must report an additional amount of gain on the sale of Brittany of $ 624,167.
B. 1980 Sale
In October 1980, petitioner sold Brittany to Charter Jet, Inc., for $ 1,500,000. The Earnest Money Contract was executed by petitioner as president of Blue Ridge, Inc., which was identified *434 on the contract as the "seller." On his work papers, Hamm computed for petitioner a loss on the sale of Brittany as follows: Selling Price
$ 1,500,000.00 Accrued RE Tax
44,350.00 RE Tax Escrow
(22,170.00)
$ 1,522,180.00 Basis
Land     $ 200,000.00 Building     1,390,394.73 Carpet     753.04 Roof     5,554.00 Smoke Detectors     3,580.00 -- ? --     8,954.71 Loan Costs     3,901.80 $ 1,613,138.28 Less Accum Dep
(51,758.00)
1,561,380.28 $ (39,200.28)
Petitioner reported the loss on Form 4797, Supplemental Schedule of Gains and Losses, attached to his 1980 return. Respondent disallowed the deduction because petitioner had not established that it was a loss sustained by petitioner. Instead, respondent determined that petitioner should report a gain on the sale of Brittany in 1980 of $ 608,259.
C. Capital Loss - 1981
When petitioner sold Brittany to Charter Jet in 1980, one of the provisions in an attachment to the Earnest Money Contract was as follows: (5) Such tenant security deposits as to the Subject Premises as have *435 been received by seller, not previously fully accounted by it to the respective depositing tenants, shall be paid over in cash by seller to buyer at the closing hereunder. The closing statement, which was dated October 30, 1980, itemized various credits and expenses of the buyer-mortgagor and the seller. Among the items were the following: Buyer
Seller
Credit
Expense
Credit
Expense
Escrow-Tenants
$ 10,000
Settlement of Rent
$ 13,912
and Security Deposits 13,912  (see attached) The following statement was attached: STATEMENT
Security Deposits
$ 11,041.00
Security Deposits Interest
355.98
Two day's prorated rent
1,222.32
November rents prepaid
1,140.00
Retained deposits and interest
152.84
Total               $ 13,912.14
On Schedule D of his 1981 tax return, petitioner deducted $ 10,000 as a short-term capital loss identified as "Additional Cost of Property Sold 1980." Respondent determined adjustments to petitioner's Schedule D wherein he disallowed the $ 10,000 deduction. III. 1313 Como
Petitioner acquired property at 1313 Como Avenue, *436 S.E. (1313 Como), in December 1970 with the intent of eventually converting it into condominiums. On his 1971 tax return, petitioner reported the following basis in the property: Land
$ 40,431.20
Building
145,039.59
Air Conditioners
9,813.06
Carpet and Furniture
13,626.60
$ 208,910.45
On December 8, 1970, petitioner executed a Quit Claim Deed for 1313 Como to Campus Realty, Inc. On December 10, 1970, Campus Realty, Inc., obtained a loan for $ 160,000 from Eberhardt, secured by a mortgage on 1313 Como. Petitioner reported items of income and expense for 1313 Como on Schedule E of his tax return for years 1971 through 1975, and until February 1976. On his 1976 return, petitioner reported a long-term capital gain of $ 23,818 (before the section 1202 deduction) for the sale of 1313 Como. On June 12, 1979, Campus Realty, Inc., executed a mortgage on 1313 Como to Guaranty State Bank to secure a loan for $ 75,000. On June 29, 1979, Campus Realty, Inc., executed a mortgage on 1313 Como to Harry J. Jensen to secure a loan for $ 29,000. Both mortgages were executed by petitioner as president of Campus Realty, Inc. On his return for 1980, petitioner *437 reported income of $ 36,318, expenses of $ 56,360, and depreciation of $ 7,120 relating to 1313 Como. On the dates shown below, petitioner received and deposited the following amounts in an account for Interfund, Inc., at First Bank Minneapolis as earnest money for the sale of 1313 Como condominium units: Earnest
Date
Money
Source
8/13/80
$ 200  James K. Ridley for unit #203
8/18/80
200  Jackie Currier for unit #204
8/18/80
500  Beverly J. Anthony for unit #102
8/25/80
200  Debra Pike & Bruce Zeega for unit #201
9/8/80
200  Heltomes for unit #304
9/10/80
200  Michael Braun for unit #204
9/17/80
2,000  David Francitic for unit #303
9/17/80
500  Jackson P. Hirshbell for unit #104
9/18/80
300  James K. Ridley for unit #203
11/26/80
1,000  Mary Schloff & Beth Torpy for unit #105
12/3/80
1,000  -
A. Repairs - 1980
On Schedule E of his 1980 tax return, petitioner deducted $ 18,503 identified as "Repairs" relating to the property at 1313 Como. Respondent disallowed the deduction because it had not been established that it was an ordinary and necessary business expense or expended for *438 the purpose designated.
B. Transfer to Interfund, Inc. - 1981
By Quit Claim Deed dated January 30, 1981, Campus Realty, Inc., transferred 1313 Como to Interfund, Inc., for a stated consideration of $ 1.00. Petitioner executed the document as president of Campus Realty, Inc. Petitioner told Hamm to treat the transfer as a sale by him and to compute capital gain based on a sales price of $ 500,000. Interfund, Inc., had filed returns declaring "No Activity" for 1974, 1975, 1976, and 1977. Interfund, Inc., had reported the same amount as its ending trial balance in 1978 and as its beginning trial balance in 1981. On January 28, 1981, petitioner, as an officer for Interfund, Inc., executed the 1313 Como Avenue, S.E., Condominium Declaration of Condominium No. 247 and the By-Laws of Condominium No. 247. The Declaration provided the following information with respect to each condominium unit represented: Approx.
Approx.
No. of
Percentage of
Unit No.
Value
Sq. Ft.
Rooms
Undivided Interest
101 $ 29,500
531.50
4
5.22 102 39,500
565.06
5
5.55 103 49,500
888.05
6
8.71 104 39,500
616.32
5
6.05 105 29,500
510.13
3
5.01 201 59,500
883.23
6
8.67 202 59,500
884.97
6
8.68 203 49,500
887.42
6
8.71 204 49,500
883.90
6
8.67 301 64,500
884.97
6
8.67 302 64,500
884.97
6
8.68 303 49,500
887.42
6
8.71 304 49,500
883.90
6
8.76 [5] 100.00%
*439 In 1981, petitioner told Hamm to begin making adjusting journal entries for Interfund, Inc., again, including the following entries recording (1) the purchase of 1313 Como and (2) the sale of 1313 Como condominium units: AJE 1
Real Estate
500,000.00
Note Receivable
2,500.00
Commitment Fee
10,600.00
Earnest Money         $ 16,000.00
Mortgage Payable         136,116.82
Accrued Interest         3,498.25
Rent         6,943.37
Security         800.00
Sale-Condos         48,547.70
Repairs
6,385.87
Advertising
615.25
Legal
1,145.00
Miscellaneous
481.16
Due to Jansco         309,821.14
(To record purchase of CR-13 Condos)         AJE 2
Cost of Sales
$ 330,600.00
Real Estate         $ 330,600.00
Sales - 1500.00, 25,000
1,500.00
325,952.30
Mortgage Payable Eberhardt
141,148.15
---
48.933.61
Closing Costs
1,051.71
Due to Jansco - Guaranty Note Pay
78,125.93
Due to Jansco - Condo Closing Cash
57,692.90
Note Receivable         2,500.00
(To record sales of condos)         *440 On the following dates, warranty deeds were executed by petitioner as an officer of Interfund, Inc., conveying the following units of Condominium No. 247: Date
Unit #
Purchaser
Sales Price
1/30/81
104
Jackson P. & Joan A. Hershbell
$ 38,000
1/30/81
303
Delbert L. & Peggy D. Ploen
46,500  1/30/81
304
Eugene C. Heltomes
46,500  1/31/81
105
Wilfred O. Sweney
28,000  2/2/81
203
James K. & Linda C. Ridley
48,000  3/12/81
101
Robert W. Anderson
29,000  4/4/81
103
Lenore K. Scallen
49,500  4/4/81
302
Stephen B. Scallen
57,500  4/21/81
102
Feraidoon Bourbour
39,000  10/29/81
201
Campus Realty
No Price stated
10/29/81
202
Campus Realty
No price stated
10/29/81
204
Campus Realty
No price stated
10/29/81
301
Campus Realty
No price stated
On Interfund, Inc.'s, 1981 Form 1120S, it reported ordinary income from the sales of all the above units, except the last four, for which no amount of income was reported, as follows: Gross receipts
$ 389,000
Cost of goods sold
380,585
Gross profit
$ 8,415
The amount of income reported was computed by deducting a cost of sales *441 based on the units' respective proportions of the $ 500,000 purchase price. On Form 4797 of petitioner's 1981 tax return, he reported a long-term gain of $ 312,114 on the sale of 1313 Como to Interfund, Inc. In his notice of deficiency, respondent disallowed the long-term capital gain reported by petitioner. Instead, respondent made the following determination: Gain on the sale of depreciable property between an individual and his 100% owned corporation is taxed as ordinary income. You have failed to establish a basis in this property of more than $ 12,500.00. Therefore your gain is Sales Price
510,965.00 Adjusted Basis
(12,500.00)
Gain on Sale of CR-13
498,465.00 C. Transfer of Units to Campus Realty - 1981
On October 29, 1981, Interfund, Inc., executed a warranty deed conveying condominium units 201, 202, 204, and 301 of 1313 Como to Campus Realty, Inc., for a stated consideration of "one dollar and all good and valuable consideration." On the same day, Campus Realty, Inc., obtained a loan from Guaranty State Bank for $ 150,000 that was secured by the four condominium units. Regarding the transfer, no gain was reported by Interfund, *442 Inc., on its 1981 return, and no income was reported by petitioner on his 1981 return. IV. Lawsuit Settlements and Legal Fees
A. Interest on Lawsuit Settlement - 1979
On November 2, 1971, a loan for $ 248,622.60 was obtained from Midway National Bank of St. Paul (Midway) for Cedar Courts, Ltd.; the debtor on the note (the Midway note) was Interfund, Inc. The Midway note was secured by a second mortgage on property operated by CR-4 Partnership. The limited partners of Cedar Courts, Ltd., and petitioner, the managing general partner, executed Continuing Guaranties in which they personally guaranteed the loan by Midway to Interfund, Inc., to the extent of $ 25,000 each. On December 2, 1974, petitioner acquired the assets of Cedar Courts, Ltd., and the interests of the other partners pursuant to an agreement. In the agreement, the limited partners of Cedar Courts, Ltd., agreed to forego their right to a return of their capital contribution in the partnership in consideration of petitioner and Interfund, Inc.'s, agreement to indemnify them and to pay when due the indebtedness to Midway. On or about June 15, 1976, the installments due on the Midway note were in *443 default, and Midway filed a Complaint in Ramsey County District Court against the limited partners and petitioner based on their personal guarantees. In settlement of the Midway lawsuit, the limited partners agreed to pay Midway $ 100,000 on or before May 2, 1979. In lieu of a crossclaim by the limited partners against petitioner based on the agreement dated December 2, 1974, the limited partners, petitioner, and Interfund, Inc., executed a supplemental agreement on April 3, 1979, providing that petitioner would reimburse the limited partners the $ 100,000 and their attorneys' fees. Petitioner agreed to pay the $ 100,000, together with interest at the rate of 8 percent per annum, in installments as follows: (1) $ 10,000, plus accrued interest, on or before October 15, 1979; (2) $ 10,000, plus accrued interest, on or before April 15, 1980; (3) $ 20,000, plus accrued interest, on or before January 15, 1981; (4) $ 20,000, plus accrued interest, on or before April 15, 1981; (5) $ 20,000, plus accrued interest, on or before July 15, 1981; and (6) $ 20,000, plus accrued interest, on or before October 15, 1981. All payments shall be applied first against the accrued interest *444 and thereafter against unpaid principal. Scallen shall have the right to prepay any portion or all of the principal balance at any time without penalty.
Petitioner agreed to pay the limited partners' attorneys' fees and out-of-pocket disbursements, an amount to be determined by subsequent affidavit by the limited partners' attorneys, in installments as follows: one-third on or before December 15, 1981; one-third on or before January 15, 1982; and one-third on or before February 15, 1982. On May 3, 1979, petitioner gave a mortgage on the CR-4 Partnership property to secure his obligation to the limited partners; the mortgage was released on September 2, 1980. As described in a letter and affidavit February 20, 1980, the total of the limited partners' attorneys' fees, $ 23,830, and out-of-pocket costs, $ 1,163.82, was $ 24,993.82. On May 3, 1979, petitioner entered into an agreement with Midway in which he agreed to pay Midway $ 55,000 in installments together with interest at the rate of 8 percent per annum. The installments would include a $ 10,000 payment on October 15, 1979; a $ 10,000 payment on December 15, 1979; and monthly payments, in amounts to be determined by *445 formula, from May 5, 1979, until September 3, 1980, at which time the remaining balance would be due in full. The Midway note for $ 428,662.60 was recorded in petitioner's 1971 records as mortgage payable-Midway. Of that amount, $ 128,662 was set up in an account called "Prepaid Interest," from which a portion was expensed each year. Hamm's work papers reflect that in 1976 the principal had been reduced from $ 300,000 to $ 157,155.72 and the amount of prepaid interest had been reduced to $ 59,370.28. Petitioner's brother, Dr. Raymond W. Scallen, was a limited partner in Cedar Courts, Ltd. He was named a co-defendant in the Complaint by Midway, but his name does not appear on the settlement documents of April 3, 1979, defining the terms of petitioner's reimbursement to the limited partners. Petitioner made the following payments to the limited partners and their attorneys: Date
Limited Partners
Attorneys' Fees
Total
Principal
Interest
10/10/79
$ 10,000
$ 3,529.12
$ 13,529.12
4/15/80
10,000
3,600.00
13,600.00
10/30/80
80,000
3,535.00
$ 24,900.94
108,529.42
Petitioner made payments of principal to Midway of $ *446 16,368 in 1979 and $ 38,632 in 1980 as well as the interest due on these amounts. On Schedule C of his 1979 return, petitioner deducted $ 46,783 as interest expense relating to the Midway lawsuit. Respondent disallowed the interest deduction because it had not been established that it was for an ordinary and necessary business expense or expended for the purpose designated.
B. Lawsuit Settlement: Limited Partners of CR-12 - 1980
The 1974 books of Interfund Services list an asset called "accounts receivable CR-12." The 1975 and 1976 books of Jansco list an asset called "CR-12 Condo" and a mortgage payable on the property. The 1977 books of Jansco include an adjusting journal entry recording petitioner's sale of the CR-12 property. On February 12, 1979, John G. Bradley, Craig W. Freeman, and J. Jerome Hopperstad (plaintiffs), limited partners of CR-12, filed a complaint in District Court in the State of Minnesota against petitioner. In the complaint, the plaintiffs alleged that petitioner, the sole general partner of CR-12, was responsible for depositing all the funds of the partnership in a bank account, for paying all legitimate partnership expenses, and for repaying *447 plaintiffs, upon liquidation, their capital contributions and shares of the profits. Further, plaintiffs alleged that subsequent to liquidating of the assets of CR-12, petitioner failed to maintain the partnership moneys in a separate account for the benefit of the partnership and, instead, used the money to pay obligations other than those of CR-12, i.e., petitioner used the funds to pay personal obligations and/or obligations of other businesses in which petitioner held an interest. The plaintiffs thus demanded a full accounting and an award for amounts to which they were entitled. On December 16, 1980, petitioner and the plaintiffs executed a Stipulation of Settlement (the Settlement). The parties to the Settlement acknowledged that petitioner had previously paid the plaintiffs $ 30,000 but that petitioner had not made any additional payments representing the plaintiffs' share of any remaining assets. Thus, petitioner agreed to pay the plaintiffs $ 30,000 as follows: (a) $ 2,000.00 to be paid upon the execution of this Agreement, and in any event on of before December 17, 1980; (b) $ 1,000.00, without interest, to be paid on the first of each and every month, beginning *448 on October 1, 1981 and ending on December 1, 1982, a total of 15 monthly payments; and (c) $ 13,000.00, without interest, to be paid on December 31, 1982. In accordance with the Settlement, petitioner made payments of $ 2,000 in 1980 and $ 3,000 in 1981. On Schedule C of his return for 1980, petitioner deducted, under other expenses, $ 88,500 for "Lawsuit Settlement"; of that amount, $ 30,000 was attributable to the Settlement. Respondent, in his notice of deficiency, disallowed the deduction because it had not been established that it was an ordinary and necessary business expense or that it was expended for the purpose designated.
C. Lawsuit Settlement: FKSI - 1980
Commencing in about 1967, petitioner and Frantz Klodt & Son, Inc. (FKSI) entered into various joint ventures and/or partnerships to acquire real estate and develop apartment buildings; FKSI was also engaged as construction supervisor or construction contractor of certain apartment buildings. In 1978, FKSI filed a six-count complaint in the Hennepin County District Court, State of Minnesota, naming as defendants petitioner and certain of his controlled or related entities. Count I alleged that FKSI *449 agreed to sell to petitioner all its rights, title and interest in the Franklin Park Partnership in consideration of petitioner's assumption of certain liabilities and the payment to FKSI of $ 76,258, which amount was never paid by petitioner. Count II alleged that FKSI terminated its interest in the Minnehaha Joint Venture in consideration of the payment by the Joint Venture to FKSI of $ 74,200, which petitioner personally guaranteed, but that petitioner failed to pay $ 18,197.01 of this consideration. Count III alleged that FKSI furnished labor and materials for the repair and alteration of the Franklin Park Partnership property for an agreed amount of $ 1,688.84, no part of which had ever been paid by petitioner. Count IV alleged that FKSI furnished materials and labor for the construction of an apartment building at 333 S.E. 8th Street, Minneapolis, for petitioner, on which there remained unpaid $ 13,364.28. Count V alleged that petitioner converted to his own use model apartment furniture owned by FKSI and used in a model apartment at the Edina 600 apartment project, which furniture had a value of $ 2,355. Count VI alleged that FKSI furnished labor and materials for the construction *450 of a 17-unit apartment building at 411 8th Street, S.E., Minneapolis, and for the construction of an 11-unit apartment building at 924 17th Avenue, S.E., Minneapolis, for which a total of $ 10,281.63 remained unpaid. On August 7, 1979, FKSI and petitioner entered into a Settlement Agreement, wherein petitioner agreed that each of the claims was "substantial and colorable." By the terms of the Settlement Agreement, FKSI agreed to accept $ 58,500 from petitioner in settlement of its claims. Said amount was to be paid in nine equal installments of $ 6,500 beginning March 1, 1980, and every 6 months thereafter. On Schedule C of his return for 1980, petitioner deducted, under other expenses, $ 88,500 for "Lawsuit Settlement", of that amount, $ 58,500 was attributable to the Settlement Agreement with FKSI. Respondent, in his notice of deficiency, disallowed the deduction because it had not been established that it was an ordinary and necessary business expense or that it was expended for the purpose designated.
D. Legal Fees - 1979
On statements received in 1979, petitioner was billed a total of $ 10,561.82 for legal services performed by the law firm of Rosen, Kaplan *451 & Ballenthin (Rosen) and a total of $ 240 for legal services by the law firm of Primus & Primus (Primus). The billing statements from Rosen may have included fees for services rendered in the latter half of 1978. Petitioner made no payments in 1979 on his accounts with either Rosen or Primus. On Schedule C of his 1979 return, petitioner deducted legal fees of $ 40,727. That amount was derived from the following entries in the 1979 record of Jansco: Jansco Daily Ledger
$ 12,009
Adjusting Journal Entry #6 -
From Brittany Loan  3,472
Adjusting Journal Entry #13 -
Fees for Florida Escrow  252
Adjusting Journal Entry #15 -
Fees for Doctors Settlement  24,994
$ 40,727
Respondent disallowed the deduction because it had not been established that the fees were ordinary and necessary or expended for the purpose designated.
E. Legal Fees - 1980
On statements received in 1980, petitioner was billed a total of $ 4,920 for legal services performed by Rosen and a total of $ 480.10 for legal services performed by Primus. The billing statements from Rosen may have included fees for services rendered in the latter half of 1979. Petitioner *452 made payments in 1980 of $ 10,144.49 for legal services, $ 10,050 to Rosen and $ 94.49 to Primus. On Schedule C of his 1980 tax return, petitioner deducted $ 7,314 as "legal and professional services." Respondent disallowed the deduction because it had not been established that it was ordinary and necessary or that it was expended for the purpose designed. V. Gerald R. Hansen Deductions
Gerald R. Hansen (Hansen) was a real estate investor whose properties included a racetrack. Hansen and petitioner met in about 1977 and established a business relationship. That relationship included Hansen's assistance regarding certain properties and real estate transactions.
A. Promotions - 1978
In 1978, Hansen received the following payments from petitioner, which he included in his income for that year: Brittany
6/21/78
$ 25,000
Brittany
8/29/78
1,000
Brittany
12/78
1,000
$ 27,000
On Schedule C of his 1978 return, petitioner deducted $ 22,282 as legal and professional fees, $ 5,000 of which was paid to Hansen in April 1978. On Schedule E, the following payments identified as "Promotion" were deducted as expenses relating to the Mark *453 Twain/Brittany property: Date
Payee
Amount
6/21/78
Gerald Hansen Racing Enterprise
$ 20,000
8/29/78
Gerald Hansen Racing Enterprise
1,000
12/8/78
Gerald Hansen Racing Enterprise
1,000
$ 22,000
In respondent's notices of deficiency, he disallowed deductions for the $ 5,000 in legal and professional fees and the $ 22,000 for promotions. Respondent determined, however, that the amounts were capital expenditures that may be amortized over 20 years and allowed the amortization based on a half year for 1978.
B. Consulting Fees - 1978
The following adjusting journal entries (AJE) were recorded on December 31, 1978, by Hamm pursuant to instructions by petitioner: St. Cloud Properties
(AJE #5)
Due to Jansco
$ 37,197.99
Contract of Deed Receivable     $ 37,197.99
To transfer contract of deed to
Mark Twain apts. -- Contract for deed
given to G. Hansen to pay for
consulting fees.
Jansco
(AJE #11)
Due from Mark Twain
$ 37,197.99
Due to St. Cloud Properties     $ 37,197.99
To transfer consultant fee     On August 16, 1978, Michael P. and Mary *454 C. Hannon sold the St. Cloud property to Harold and Marlene Houck on a contract for deed. On December 6, 1978, the Hannon's assigned the contract for deed to Richard D. Kantrud. On August 13, 1980, Kantrud deeded the St. Cloud property to the Houcks. On Schedule E of petitioner's 1978 return, $ 37,198 was deducted as "Consulting" relating to the Mark Twain/Brittany property. In respondent's notice of deficiency, he disallowed the deduction for consulting fees. Respondent determined, however, that it was a capital expenditure that may be amortized over 20 years and allowed the amortization based on a half year for 1978.
C. Commissions - 1979
In 1979, petitioner obtained a loan of $ 75,000 from Guaranty State Bank that was secured by a mortgage on property located at 1313 Como. On December 31, 1979, Hamm recorded the following adjusting journal entry, including a $ 25,000 deduction as a commission to Hansen: Jansco
AJE #6
Cash in bank - Guaranty State Bank
$ 12,657.55
Due to Brittany
18,870.45
Legal
3,472.00
Commission
25,000.00
Note Payable - Guaranty State Bank     $ 60,000.00
To record mortgage and disbursement of proceeds.     *455 The records of Guaranty State Bank that were in the possession of the Federal Deposit Insurance Corporation (FDIC) did not show any payments to Hansen on behalf of petitioner in 1979. On Schedule C of petitioner's 1979 return, he deducted $ 25,000 identified as "Commissions." In his notice of deficiency, respondent disallowed the 1979 deduction for commissions because it had not been substantiated.
D. Consulting Fees - 1980
In 1980, petitioner received a loan of $ 95,000 from Guaranty State Bank. Certain records of Guaranty State Bank in the possession of the FDIC indicate two disbursements to Hansen in 1980 in the amounts of $ 25,000 and $ 15,000. At the end of the year, petitioner directed Hamm to record the following adjusting journal entry in the books of Jansco: AJE #14
Due to Brittany
$ 20,000
Due to S.B.S.
50,000
Consulting Fee
25,000
N/P First Guaranty     $ 95,000
To record N/P per S.B.S.
phone call  On Schedule C of petitioner's 1980 tax return, petitioner deducted $ 25,000 identified as "consulting," which was the amount allegedly paid to Hansen. Respondent disallowed the deduction because it had not *456 been substantiated.
E. Commissions - 1980
On the following dates, the following checks were made out to Hansen: Date
Amount
2/8/80 $ 2,000
2/27/80
3,000
3/7/80 5,000
On Schedule E (Supplemental Income Schedule) of his 1980 tax return, petitioner deducted $ 10,000 as "Commissions" relating to certain property at 1501 University. Respondent disallowed the deduction because it was not established that the amount was an ordinary and necessary business expense or that it was paid. VI. Other Determinations
A. Forgiveness of Liabilities - 1980
In 1980, petitioner sold Brittany. On its books for 1980, Jansco closed the account "Due to/from Brittany" as follows: AJE #15
Cash - N.W.
$ 123.96
Escrow for tenants - Brittany
10,000.00
Due to S.B.S.
109,657.57
Accounts Payable - Brittany     $ 24,627.89
Due to Brittany     95,153.64
To close Brittany accounts
In his notice of deficiency, respondent included the $ 24,627.89 in petitioner's 1980 income for the forgiveness of a liability which petitioner had previously deducted as an expense.
B. Forgiveness of Liabilities *457 - 1981
In his notice of deficiency, respondent included $ 28,062 in petitioner's 1981 income for the forgiveness of liabilities petitioner previously had deducted as accrued liabilities. These liabilities consist of the following: Anderson House of Furniture
$ 11,186.84
Edina 600
6,479.44
St. Louis Park
30.50
Cedar Court (C/62)
130.88
Monroe House
8,354.18
Franklin Park
1,188.12
[6] $ 28,062.12
Regarding the Anderson House of Furniture, the following adjusting journal entries were recorded in the 1975 books of Interfund/Jansco: AJE # 20
Debit
Credit
A/P Anderson
$ 2,000.00
N/P Central N.W.
21,112.75
Gain on forgiveness  $ 23,112.75
To reclassify payment to Anderson
and to record forgiveness  AJE # 50
Gain on Forgiveness
$ 9,800.00
Due to SBS  $ 25,180.66
A/P Anderson House of Furn.
15,380.66
To record checks paid out of
SBS personal account  C. Teaching in France - 1981
In the summer of 1981, petitioner taught at a summer session at the University of Lyon in France. Petitioner was paid $ 6,000 by *458 the University of Minnesota Foundation for teaching in France. Petitioner also received $ 4,000 from the University of Lyon as reimbursement for expenses while teaching in France. On his 1981 tax return, petitioner reported employee business expenses of $ 24,044 and income of $ 4,500 (from the University of Minnesota Foundation) for teaching at the summer session in France. Petitioner did not include any of the $ 4,000 payment in income or as a reduction of his claimed employee business expenses of $ 24,044. Respondent disallowed the deduction for employee business expenses because none of the expenses had been substantiated or shown to be business related.
D. Sunnyside, Inc.
Sunnyside, Inc., was incorporated in 1973, and petitioner was its sole shareholder and corporate officer. In 1975, the following adjusting journal entry was recorded in the books of Sunnyside, Inc.: Due from S.B.S. (petitioner)
$ 1,000
Common Stock          $ 1,000
Each balance sheet filed with Sunnyside, Inc.'s, tax returns from 1975 through 1979 reflects a $ 1,000 balance in each of these accounts. On its end of the year trial balance in 1973, Interfund, *459 Inc., showed that it owed Sunnyside, Inc., $ 72,915.92. On its end of the year trial balance in 1974, Interfund, Inc., showed that Sunnyside, Inc., owed $ 31,253.26 to Interfund, Inc. On September 9, 1979, petitioner transferred, by Quit Claim Deed, certain property, including apartment unit 115, to Sunnyside, Inc. On October 3, 1979, Sunnyside, Inc., executed a mortgage to Midwest Federal Savings and Loan Association of Minneapolis for $ 60,000, secured by certain property, including apartment unit 115. On the balance sheet in Sunnyside, Inc.'s, 1979 tax return, it reported a beginning balance of zero and ending balance of $ 134,538 in the account called loans from shareholders. VII. Additional Facts Re Fraud
1976
In 1976, petitioner claimed a deduction for a net operating loss (NOL) carryforward in the amount of $ 703,924. Respondent reduced the amount of the NOL deduction to $ 62,600, based on adjustments to petitioner's taxable income in 1973, 1974, and 1975. Some of those adjustments are described below. In 1973, petitioner failed to include in income $ 100,000 he received from Franklin Park Partnership for services. Petitioner had directed Hamm *460 to report the amount as an expense on Franklin Park Partnership's return, and the Form K-1 issued to petitioner identified the amount as his salary. In 1973, petitioner also understated his distributive share or ordinary income from Cedar Courts, Ltd., partnership in the amount of $ 12,671. In 1974, petitioner understated interest income in the amount of $ 5,249. In 1974, he also claimed a bad debt deduction of $ 893,306. The deduction was based on items in the following adjusting journal entry in the 1974 books of Interfund/Jansco recorded by Hamm pursuant to petitioner's instructions: AJE #35
Bad Debts
$ 893,305.54
Due to Monroe House     $ 203,424.70
Due to Cedar Courts     24,077.04
Due to CR-3     15,650.15
Due to CR-4     160,418.84
Due to CR-5     41,118.80
Due to M-2     448,616.01
(To withdraw uncollectible receivables)
Respondent disallowed $ 404,963 of the alleged bad debt deduction, representing the amounts due from Monroe House, Cedar Courts, CR-4, and CR-5. On its books for 1974 and 1975, Monroe House partnership listed $ 203,425 and $ 17,364, respectively, as its *461 year-end balances of accounts payable to Interfund/Jansco. On its books for 1974 and 1975, Interfund/Jansco listed $ 186,088 and $ 270,645, respectively, as its year-end balances of accounts payable to Monroe House partnership. The Monroe House partnership terminated in 1976. As of the date of termination, the books of Monroe House partnership show an account receivable of $ 67,202 from Interfund/Jansco, which amount was distributed to petitioner. As of December 31, 1976, the books of Interfund/Jansco show an account payable of $ 270,645 to Monroe House partnership. In a journal entry dated January 1, 1977, the same amount was reclassified as an increase to the account "Due to Stephen B. Scallen." In 1975 and 1977, petitioner included the amounts written off as bad debts for CR-4 partnership, Cedar Courts partnership, and CR-5 partnership in his basis in various properties sold in those years. In 1975, Franklin Park partnership deducted $ 46,500 as interest expense on a Contract for Deed payable to Interfund/Jansco; petitioner did not report the amount in income in 1975. In 1975, petitioner reduced his Schedule C gross receipts by $ 74,352. The amount of the reduction represents *462 expenditures of Sunnyside, Inc., which petitioner admitted was a separate taxable entity during the years in issue.
1977
Petitioner reported a long-term capital loss of $ 479,531 regarding the sale of the Franklin Park Partnership property in 1977. As reported, the amount realized by the partnership was limited to $ 3,540,215.04, an amount described as the property's fair market value (the FMV limitation), [7] thereby reducing the amount of the gain on the sale by $ 1,474,329.37. In a sworn affidavit dated June 30, 1976, petitioner stated that "the present value of the property is at least $ 4,500,000." Petitioner also reported in 1977 a NOL deduction carryforward. The deduction includes an amount representing a loss from the sale of Monroe House partnership property in 1976. The loss was reported on an amended return for Monroe House partnership *463 and was computed, pursuant to petitioner's instructions, based on an amount realized of $ 2 million, which was described as the amount of the FMV limitation. The amount of petitioner's share of the loss was not reported on petitioner's 1976 tax return but was built into the NOL carryforward deduction for 1977. In a sworn affidavit in 1975, petitioner represented that the property's value was $ 3,575,000.
1978 - 1981
In 1978, petitioner failed to report (1) gain of $ 54,564 from the sale of property located at 1018 16th Avenue South and (2) gain of $ 4,131 from the sale of a boat. In 1981, petitioner omitted from income various items totaling $ 11,165. In 1978, 1979, and 1980, petitioner claimed long-term capital loss carryovers, based on the loss reported in 1975 attributable to the sale of the Franklin Park partnership property (using the FMV limitation). In 1978, 1979, 1980 and 1981, petitioner reported a NOL carryforward deduction. OPINION I. Franklin Park Partnership
A. The Eberhardt Company Note
We must determine whether petitioner's gain realized on the retirement of the Eberhardt note in 1977 is capital gain or ordinary income. In his *464 petition, petitioner asserted that the Eberhardt note was not satisfied in 1977. On brief, however, petitioner apparently concedes that $ 220,400 of gain was realized in 1977 on retirement of the Eberhardt note but maintains that its proper character was capital gain.
Capital gain is derived from the sale or exchange of a capital asset. Section 1222(1) and (3); section 1.1222-1(a), Income Tax Regs. Petitioner argues that the Eberhardt note was a capital asset and that, pursuant to section 1232, its retirement constitutes an "exchange" for purposes of section 1222. Respondent contends that section 1232 does not apply and that the character of the gain is not capital because there was no sale or exchange and because the note was not a capital asset. We agree with respondent.
Retirement of a note or the collection of proceeds due on an executory contract generally does not qualify as an "exchange" for purposes of section 1222. National-Standard Co. v. Commissioner,749 F.2d 369, 371 (6th Cir. 1984), *465 affg. 80 T.C. 551 (1983). See Ehlers v. Vinal,382 F.2d 58, 62 (8th Cir. 1967); Wood v. Commissioner,25 T.C. 468 (1955). In this case, the note's maturity was essentially accelerated because of the foreclosure action against Franklin Park Partnership, and petitioner merely collected the funds due on the note.
In appropriate circumstances, however, retirement of certain indebtedness may be considered an "exchange." Section 1232 provides, in pertinent part: (a) General Rule. -- For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and government or political subdivision thereof -- (1) Retirement. -- Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor * * *.
Respondent argues that section 1232 does not apply to these *466 facts because the note was issued by a partnership, not a corporation or a governmental entity, and because the note was not a capital asset in the hands of the holder. Respondent further argues that the note in question is not the kind of indebtedness that section 1232 is intended to reach, citing Bradshaw v. United States,683 F.2d 365 (Ct. Cl. 1982). Without determining whether the Eberhardt note was a capital asset in petitioner's hands or which of the partnership or the corporation was the true issuer of the note, we conclude that the note was outside the intended scope of section 1232. We have previously considered section 1232 and its legislative history. As a result, we were and remain convinced that Congress enacted section 1232 and its predecessor to apply only to corporate or governmental indebtedness of independent significance; thus any indebtedness having "no independent significance other than as evidence of an agreed purchase price for property sold" would be denied the preferable tax consequences emanating from "exchange" treatment through section 1232. *467 Estate of Stahl v. Commissioner,52 T.C. 591, 598 (1969), affd. in part, revd. in part (on other grounds) 442 F.2d. 324 (7th Cir. 1971). See also Bradshaw v. Commissioner, supra at 379; Wilson v. Commissioner,51 T.C. 723, 729 (1969). On these facts, the Eberhardt note had no significance independent of the purchase price it represented. Because section 1232 does not apply in this case and because petitioner's transaction does not otherwise qualify as a sale or exchange, we conclude that the gain of $ 220,400 must be reported as ordinary income.
B. Dr. Parrott's Share of Liquidated Assets
We must determine whether petitioner realized ordinary income in 1977 of $ 70,577 representing Dr. Parrott's distributive share of Franklin Park Partnership's assets which were liquidated. In his brief, respondent itemized his computation of the amount of Dr. Parrott's share, i.e., the excess assets retained by petitioner, as follows: Franklin Park Partnership
Assets - Receivable
$ 845,886.00 Less Liabilities:
Eberhardt Note     (400,000.00)
Interest on Eberhardt Note     (93,000.00)
Assets for Distribution
352,886.00 X 20% Dr. Parrott's Share
$ 70,557.20 *468 Petitioner claims that he was not required to report this amount in his income for 1977 because of the provision in the partnership agreement providing "that before distributions can be made reserves must be established to satisfy contingent liabilities." Petitioner argues that a contingent liability existed in the lawsuit pending at the end of 1977 regarding his guarantee of the Eberhardt note.
Taxpayers must report "all income from whatever source derived," section 61, including "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 431 (1955). The Supreme Court has also stated: When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *469 North American Oil v. Burnet, [286 U.S. 417 (1932)]supra at p. 424. * * * [James v. United States,366 U.S. 213, 219 (1961).] In this case, petitioner had dominion and control over all the assets of Franklin Park partnership in 1977. In fact, we testified that he did not hold the money in escrow or trust for Dr. Parrott but that the money was used for expenditures of his other entities. Moreover, petitioner did not cause a "reserve" to be set aside, as required by the partnership agreement, for the satisfaction of the asserted contingent liabilities. Thus, even though Dr. Parrott may have a claim on the funds, respondent properly included the amount in petitioner's 1977 income. See Estate of Etoll v. Commissioner,79 T.C. 676 (1982). Petitioner also argues that "the evidence further indicates" that petitioner was advised that Dr. Parrott was electing to have his partnership interest purchased by petitioner. Petitioner does not identify such evidence, and the testimony of Dr. Parrott does not support the contention. II. Mark Twain Hotel/Brittany Apartments
A. 1979 Transactions
We must determine *470 whether petitioner correctly reported gain in 1979 on the sale of Brittany. Petitioner argues that he properly reported gain of $ 172,300 on the sale and reacquisition of Brittany. Petitioner maintains that although he did not expressly elect on his 1979 return to report gain on the installment method, the amount of gain actually reported was as if an election had been made and that, in any event, he now may make the election at trial. Respondent argues that petitioner's "reacquisition" of Brittany in November 1979 was a rescission of the January contract; thus, no gain would be recognized and petitioner would maintain the same adjusted basis in the property. [8] In the alternative, respondent argues that the entire gain realized on the January sale must be recognized in 1979 and that petitioner is precluded from reporting the gain on the installment method under section 453. Section 1001(c) provides that "[e]xcept as otherwise provided in *471 this subtitle [A], the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized." No gain shall be recognized, however, if in the year of sale, the sale is rescinded and the taxpayer accepts reconveyance of the property and returns the buyer's funds. Penn v. Robertson,115 F.2d 167 (4th Cir. 1940). We agree with respondent's statement of the law, but we do not agree that a rescission occurred on these facts. Under Minnesota law, rescission has been defined as the unmaking of a contract. Abdallah, Inc. v. Martin,65 N.W.2d 641, 644 (Minn. 1954), and cases cited therein. A rescission may be effected by one of three general methods -- (1) by mutual agreement of the parties, (2) by one party declaring a rescission based on a legally sufficient ground, or (3) by applying to the courts for a judicial decree of rescission. 65 N.W.2d at 644. The evidence here does not come within any of *472 the described forms of rescission. Nevertheless, respondent would ask us to deem a rescission in substance because, as he contends, the parties were essentially returned to the status quo ante the January contract as a result of the November contract. We need not decide if such a circumstance gives rise to a rescission, however, because we disagree with respondent's analysis of the facts. Simply stated, Blue Ridge, Inc., was the transferor of Brittany in the January contract, and Campus Realty, Inc., was the transferee of Brittany in the November contract. Although petitioner controlled both corporations, we will not disregard the corporate form. Petitioner testified that each corporation, among others, was occasionally "used as an agent or as merely a title holding device"; however, such an agency relationship has not been argued by either party nor is it otherwise borne out by the record. Even assuming an agency for petitioner existed through both corporations, we are still addressing a different "other" party in each contract, i.e., Hansen in the January contract and Herman in the November contract. To deem a rescission would require the Court also to disregard the transfer *473 from Hansen to Herman, and respondent has provided no reason to do so. Thus, we conclude that no rescission occurred. Petitioner computed a gain on the sale in January 1979 in excess of $ 570,000; however, he maintains that he "was entitled to elect the provisions of section 453 and report only the amount of cash received, $ 172,300, as the gain realized in 1979." Petitioner's argument is unclear and confusing in that it seems to overlap concepts of section 1038, which, in the case of a seller's reacquisition of real property, generally provides for recognition of gain only to the extent of money or other consideration received prior to reacquisition, and section 453, which provides for reporting gain on the installment method. In any event, we conclude that petitioner may not use either section 1038 or section 453.
Section 1038 applies only to certain reacquisitions of real property. Section 1.1038-1(a)(3)(i), Income Tax Regs. *474 , provides that if in addition to discharging the purchaser's indebtedness that arose from the sale, the seller pays consideration in reacquiring the real property, section 1038 will generally apply if the reacquisition and the payment of additional consideration are provided for in the original contract for sale. The regulation further provides: This section generally shall not apply to a reacquisition of real property where the seller pays consideration in addition to discharging the purchaser's indebtedness to him that arose from the sale [(1)] if the reacquisition and payment of additional consideration was not provided for in the original contract for the sale of the property and [(2)] if the purchaser has not defaulted in his obligations under the contract or such a default is not imminent. * * *
In this case, petitioner was to pay in excess of $ 311,000 to reacquire the property, and the original contract for sale did not provide for reacquisition or for the payment of additional consideration. Further, although there was testimony that Herman was having financial difficulties, it has not been established from the record that he was in default or that default was *475 imminent. Consequently, section 1038 does not apply to these facts. Petitioner argues that "even where a taxpayer has made an invalid election inconsistent with an installment election, he has been allowed at trial to elect the installment method so long as what he did on his original return was done in good faith." For this proposition petitioner relies on Estate of Broadhead v. Commissioner,T.C. Memo. 1972-195. Petitioner misstates the law. Significant to the decided cases, including Estate of Broadhead, is that the taxpayers in those cases did not report the sale of the property in any manner. See Pollack v. Commissioner,47 T.C. 92, 111-113 (1966), affd. on other grounds 392 F.2d 409 (5th Cir. 1968). The method of reporting gain elected on a return, installment method or other, is irrevocable once made. Pacific National Co. v. Welch,304 U.S. 191, 194-195 (1938); Pollack v. Commissioner,47 T.C. at 112-113. In this case, petitioner reported an amount of gain on the sale of Brittany; *476 it was not reported on the installment method, unlike other items on petitioner's 1979 tax return that were identified as "Installment Sales" and that included computations for determining gain from what appears to have been gross profit percentages. Petitioner thus falls outside of the case law on which he relies and may not now elect installment treatment under section 453. We must now determine the proper amount of gain petitioner must report in 1979. The parties have stipulated that petitioner's sales price was $ 1,700,00 and that petitioner's adjusted basis was $ 979,796. The difference in these amounts produces a gain of $ 720,204. Petitioner argues that the amount of gain should be reduced by commissions of $ 122,740 allegedly paid to Hansen and by repairs of $ 25,000. Although Hamm's work papers include these amounts in his computation of gain, Hansen's testimony and personal notes do not corroborate the alleged payment of commissions in 1979, and petitioner has otherwise failed to substantiate either payment. They therefore are not allowed as a reduction of the gain. Respondent contends that petitioner's amount realized, and hence the resulting gain, must be increased *477 by $ 39,900, the real estate taxes paid by the purchaser (9/12 x $ 53,200). According to respondent, this amount was paid in 1979 but was actually a 1978 property tax, and because petitioner would have been liable for the "1978 property taxes," any of such amount paid by the purchaser would be income to petitioner. Petitioner does not dispute the amount of taxes respondent claims were paid by the purchaser but argues that the taxes are 1979 property taxes, for which the purchaser's payment of his agreed share would not increase petitioner-seller's amount realized. To make this determination, we must consider Minnesota State law and the particular language employed by the parties in their contract: "Buyer to pay 9/12 of the real estate taxes due and payable in the year 1979." (Emphasis supplied.) Property taxes do not constitute a personal obligation of the property owner but rather a lien against the property. Northwest Bank (N.A.)- Duluth v. Goodyear Tire and Rubber Company,346 N.W.2d 377, 380 (Minn. App. 1984), and cases cited therein. Under Minnesota law, *478 272. 31 Lien of real estate taxes The taxes assessed upon real property shall be a perpetual lien thereon, and on all structures and standing timber thereon and on all minerals therein, from and including January 2 in the year in which they are levied, until they are paid; but, as between grantor and grantee, such lien shall not attach until the first Monday of January of the year next thereafter. As amended Laws 1967, c. 578 sec. 1, eff. May 19, 1967. [Minn.Stat. sec. 272.31 (1982). Emphasis supplied.]
"The date of attachment is also the date on which the taxes become due and payable." Northwest Bank (N.A.)- Duluth v. Goodyear Tire and Rubber Company, supra.(Emphasis supplied.) See Minn. Stat. sec. 276.01 (1982). See also Independent-Consolidated School District No. 27 of Mower County v. Walderon,63 N.W.2d 555, 559 (Minn. 1954). Upon this legal foundation, we conclude that petitioner must increase his amount realized on the January 31, 1979, sale *479 by $ 39,900. The real estate taxes levied in 1978 became a lien which, for grantor-grantee purposes, attached to the property on the first Monday in January 1979, and thus became due and payable on that date. Because petitioner did not sell the property until January 31, 1979, the amounts received from the buyer for real estate taxes due and payable in 1979 are properly added to petitioner's amount realized. Petitioner's gain on the sale of Brittany in 1979 is thus $ 760,104 ($ 720,204 + $ 39,900), or $ 587,804 more than reported on petitioner's return.
B. 1980 Sale
We must determine the amount of gain realized on the sale of Brittany to Charter Jet in 1980. The parties stipulated the amount realized on the sale as follows: Sales Price
$ 1,500,000 Real Estate Taxes
44,350 Less
Real Estate Tax Escrow (22,170)
Amount Realized
$ 1,522,180 Remaining for determination, then, is petitioner's adjusted basis in Brittany at the time of sale. As already discussed, the parties disputed whether petitioner's Brittany transactions in 1979 constituted a sale and subsequent repurchase, a rescission, an installment sale under section *480 453, or a reacquisition under section 1038. We concluded that petitioner must recognize the full amount of gain on the sale in January 1979. Thus, petitioner's basis at the time of the sale in 1980 must be based on his consideration paid in the November 1979 transaction in which he reacquired Brittany and on any subsequent adjustments to that basis. See sections 1011, 1012, and 1016. Because we have concluded that petitioner was taxable in 1979 on the full amount of gain realized in 1979, his basis in the property must be adjusted to reflect that determination. After careful review of alternative computations submitted by the parties, we conclude that petitioner's basis in Brittany as of October 1980 consisted of the following: Basis in note secured by property: Original face amount
$1,527,700 Hansen payment (133,000)
Payments reported in 1979
( 30,281)
Balance
$1,364,419.00 The amount of money and fair market value of other property paid or   transferred in connection with  the reacquisition:  To Herman    261,916.57 To Hansen    137,280.59 Accumulated depreciation from
November 1979 to October 1980  (51,758.00)
Cost of refinancing in May 1980
3,901.80 Improvements, November 1979 to October 1980  9,887.00 Adjusted basis 1,725,646.96 *481 Because the amount realized was $1,552,180.00, petitioner incurred a loss in 1980 of $173,466.96. C. Capital Loss - 1981
We must determine whether petitioner is entitled to a capital loss in 1981 attributable to the sale of Brittany to Charter Jet in 1980. Petitioner maintains that the claimed loss is attributable to the tenant security deposits. Specifically, petitioner argues that he was required by the sales agreement to pay over the security deposits, that at closing "$ 10,000 of this escrow was credited to petitioner as part of his consideration," and that when he did not receive the $ 10,000 in 1981, he properly claimed a loss on his tax return. Respondent argues that the $ 10,000 item was simply paid on petitioner's behalf of closing and that the payment of an apparent obligation of petitioner (arising out of the sales contract) does not constitute a reduction in the amount realized or the cost of the sale. We agree with respondent. Moreover, petitioner's assessment of the relevant facts is erroneous; petitioner states that $ 10,000 of the tenant escrow was credited to him as part of his consideration while the closing statement unambiguously identifies *482 the item as petitioner's expense. We also note that a separate item, Setlement of Rent and Security Deposits, would seem to have satisfied the provision in the sales agreement relied on by petitioner. Thus, in view of petitioner's failure to offer any evidence that would support the claimed deduction, we must sustain respondent's disallowance. III. 1313 Como
A. Repairs - 1980
We must determine whether petitioner is entitled to deduct $ 18,503 as repairs expense in 1980 relating to 1313 Como.
Incidental repairs that keep property in ordinary and efficient operating condition and that do not add value tot he property are ordinarily deductible expenses. Section 1.162-4, Income Tax Reg.; Bloomfield Steamship Co. v. Commissioner,33 T.C. 75, 84-85 (1959), affd. per curiam 285 F.2d 431 (5th Cir. 1961). Expenses that are otherwise ordinarily deductible as ordinary and necessary business expenses, however, must be capitalized if they are part of a plan of capital improvement. United States v. Wehrli,400 F.2d 686, 689-690 (10th Cir. 1968), *483 and cases cited therein. See section 263. Whether an expense is deductible or must be capitalized is a question of fact, Plainfield-Union Water Co. v. Commissioner,39 T.C. 333, 337 (1962), and whether an expenditure is part of a plan of capital improvement is a question of fact, United States v. Wehrli,400 F.2d at 690. Respondent does not question the existence of the expenditure but argues that it was a capital expenditure pursuant to a plan of capital improvement. Respondent notes petitioner's activities in converting 1313 Como to condominiums in 1980 as support for his position. Petitioner argues that "[t]he mere fact that petitioner anticipated the conversion of the rental units to condominiums is not a valid ground for making capital an ordinary charge against rental income." We agree, however, petitioner did not produce any evidence that might establish that the nature of the repairs was consistent with deductibility under the above regulation. On the evidence, we cannot determine the true nature of the repairs expenditure. We must therefore sustain respondent's determination, in which he disallowed the deduction and allowed *484 the expenditures to be capitalized, because of petitioner's failure to meet his burden of proof. Rule 142(a).
B. Transfer to Interfund, Inc. - 1981
We must determine whether petitioner's 1981 transfer of 1313 Como to Interfund, Inc., was a sale or a contribution to capital. [9]
*485 Respondent determined in his notice of deficiency that petitioner could not benefit from capital gains treatment from his sale of 1313 Como to his wholly owned corporation, Interfund, Inc., that petitioner's adjusted basis was no more than $ 12,500, and that therefore petitioner must recognize ordinary income of $ 498,465. Beginning with his trial memorandum, however, respondent has taken the position that there was not a sale of 131 Como to Interfund, Inc., but rather a contribution to its capital. Respondent thus argues (1) that petitioner must not report any gain on the transfer of 1313 Como to Interfund, Inc., (2) that Interfund, Inc., must take a carryover basis in 1313 Como, and (3) that the sale of the nine condominium units by Interfund, Inc., produces additional ordinary income of $ 247,505 to petitioner (flowing through Interfund, Inc., petitioner's wholly owned small business corporation). In the alternative, respondent argues that the transfer to Interfund, Inc., should be disregarded for tax purposes because the corporation was merely a conduit for petitioner's evasion of taxes. Petitioner maintains that his transfer of 1313 Como to Interfund, Inc., was a sale for *486 tax purposes and that he properly reported his gain on the transaction. We agree with respondent's primary argument and therefore do not address his alternative argument. In support of his primary position, respondent advances two theories: one, that the transaction constituted a contribution to the capital of Interfund, Inc., and two, that the transaction constituted a section 351 transfer to Interfund, Inc. If a corporation acquires property in either a qualifying section 351 transfer or as a contribution to capital (that otherwise does not qualify under section 351), the corporation will have a carryover basis in the property, i.e., the same as the transferor's basis. Section 362(a). If section 362(a) does not apply to the transfer, and the corporation acquires the property in a bona fide sale, its basis in the property is generally its cost as determined under section 1012.
Whether a transfer of property to a corporation by its shareholders is a sale or a contribution to capital *487 is a question of fact. Aqualane Shores, Inc. v. Commissioner,30 T.C. 519, 530 (1958), affd. 269 F.2d 116 (5th Cir. 1959). Such a determination generally requires an analysis of the substance of a transaction and not the form in which it was cast by the parties. Kolkey v. Commissioner,27 T.C. 37, 58 (1956), affd. 254 F.2d 51 (7th Cir. 1958), and cases cited therein. Various facts are considered to determine the true nature of an advance or transfer of property to a corporation: Was the capital and credit structure of the new corporation realistic? What was the business purpose, if any, of organizing the corporation? Were the noteholders the actual promoters and entrepreneurs of the new adventure? Did the noteholders bear the principle risks of loss attendant upon the adventure? Were payments of "principal and interest" on the note subordinated to dividends and to the claims of creditors? Did the noteholders have substantial control over the business operations; and if so, was such control reserved to them as an integral *488 part of the plan under which the notes were issued? Was the "price" of the properties, for which the notes were issued, disproportionate to the fair market value of such properties? Did the noteholders, when default of the notes occurred, attempt to enforce the obligations? [Kolkey v. Commissioner,27 T.C. at 59.] Respondent argues that the transaction was not a sale in either form or substance. We agree. No sales agreement or documentation of the sale was offered into evidence. The Quit Claim Deed offered into evidence identifies the transfer of 1313 Como for a stated consideration of one dollar, but it does not mention the alleged sales price of $ 500,000. Petitioner now admits that the terms of sale were not memorialized in a written document; however, he maintains that no such written agreement is required and that "[t]he parties had agreed on a purchase price and petitioner was in fact paid." Petitioner's statement that the parties had agreed on a price is misleading because petitioner himself was or represented each party; thus, petitioner determined the amount of the alleged purchase price unilaterally. The evidence also does not support *489 the contention that petitioner was paid the full amount of the alleged purchase price of $ 500,000. Petitioner does not identify any evidence in support of full payment. Neither debt instruments nor evidence that Interfund, Inc., would assume any existing liabilities on the property were offered. Respondent, however, notes an adjusting journal entry suggesting that Interfund, Inc., paid off a mortgage of $ 141,148.15, paid petitioner's note to Guaranty for $ 78,125.93, and paid petitioner $ 57,692.90, all from the sales proceeds of condominium units. Respondent argues that this left a balance due of $ 223,033.02 on the alleged purchase price and that there is no evidence that this amount was ever paid to petitioner, except perhaps in the retransfer to petitioner of four condominium units in October 1981. As noted by respondent, such factors indicate that payment was dependent on the success of the business, which raises a strong inference that the transaction was a capital contribution and not a bona fide sale. See Bradshaw v. United States,683 F.2d 365, 375 (Ct. Cl. 1982), citing to Burr Oaks Corp. v. Commissioner,43 T.C. 635 (1965), affd. *490 365 F.2d 24 (7th Cir. 1966). Based on all of the above facts and circumstances, we conclude that petitioner's transfer of 1313 Como to Interfund, Inc., was a contribution to capital and not a bona fide sale. Petitioner's transfer also qualifies as a section 351 transfer. Section 351 provides that: (a) General Rule. -- No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. * * *
Requirements of section 351 are met when assets are transferred to a preexisting wholly owned corporation even though no additional stock or securities are issued. Lessinger v. Commissioner,85 T.C. 824 (1985). In this case, petitioner transferred 1313 Como to his wholly owned, fully controlled corporation. Thus, under either of respondent's analyses, *491 Interfund, Inc., must take a carryover basis in the property, and petitioner has no gain upon the transfer. Respondent maintains that the proper amount of the carryover basis should be computed by starting with petitioner's original purchase price in 1971, and making all necessary adjustments to basis thereafter. Respondent's agent computed petitioner's adjusted basis in 1313 Como at the time of sale on February 1, 1981, in the amount of $ 144,748, as follows: 1/1/71
Land
$ 40,431.20 1/1/71
Building
145,039.59 1/1/71
Air Conditioner
9,813.06 1/1/71
Carpet & Furniture
13,626.60 1/1/73
Furniture
3,591.35 Original cost
$ 212,501.80 Accumulated dep. 1971-1981
(67,754.00)
Adjusted basis 2/1/81
$ 144,747.80 Respondent's agent then determined the amount of basis to be assigned to each condominiums unit based on a percentage determined from the units' assigned value in the Declaration of Condominium No. 247. In maintaining his position, respondent disregards petitioner's alleged sale of the property in 1976 and petitioner's alleged repurchase of the property in 1980. Petitioner's contention that he sold the *492 property to his brother-in-law in 1976 and later repurchased it in 1980 is supported only by his testimony, adjusting journal entries, and tax returns. Given the absence of documentation that usually accompanies bona fide transfers such as sales agreements or mortgages, we conclude that petitioner's evidence, i.e., self-serving testimony and unilateral book entries, fails to establish the alleged sale and repurchase. We also would infer from petitioner's failure to call his brother-in-law as a witness that such testimony would not corroborate petitioner's position. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Cf. Kean v. Commissioner,469 F.2d 1183, 1187-1188 (9th Cir. 1972), affg. in part and revg. in part (on other grounds) 51 T.C. 337 (1968). We therefore agree with respondent's computation of petitioner's basis in 1313 Como at the time of transfer to Interfund, Inc., except that an adjustment is necessary for the repairs of $ 18,503. Petitioner's adjusted basis, and Interfund, Inc.'s, carryover basis was thus $ 163,251. In order to determine the *493 proper amount of gain to Interfund, Inc., upon the sale of the condominium units, we must apportion the amount of the carryover basis among the units. Such an allocation is made on an equitable basis. Section 1.61-6, Income Tax Regs. Described below are the units' respective bases as determined from the assigned values laid out in the Declaration of Condominium No. 247: Unit No.
Assigned Value
% of Assigned Value
Basis
101
$ 29,500 4.657
$ 7,602.60  102
39,500 6.235
10,178.70 103
40,500 7.814
12,756.43 104
39,500 6.235
10,178.70 105
29,500 4.657
7,602.60  201
59,500 9.392
15,332.54 202
59,500 9.392
15,332.54 203
49,500 7.814
12,756.43 204
49,500 7.814
12,756.43 301
64,500 10.181
16,620.58 302
64,500 10.181
16,620.58 303
49,500 7.814
12,756.43 304 49,500
7.814 12,756.43
Total
$ 633,500
100.00 $ 163,250.99
The total basis of the units sold in 1981 (all units except numbers 201, 202, 204, and 301, is $ 103,208.91. Thus, because the amount of the gross receipts to Interfund, Inc., for the units sold wqs $ 389,000, *494 the amount of ordinary income on the units sold is $ 285,791.09. The the extent this amount exceeds the amount of income reported by Interfund, Inc., on the sale of the units, there must be an adjustment for purposes of Interfund, Inc.'s taxable income. The adjustment to Interfund, Inc.'s, taxable income, to the extent not otherwise adjusted by the stipulation or other determinations herein, will pass through to petitioner because Interfund, Inc., was petitioner's wholly owned small business corporation. C. Transfer to Campus Realty, Inc. - 1981
We must determine whether petitioner had income in 1981 when Interfund, Inc., transferred the remaining condominium units to Campus Realty, Inc. Respondent argues that, in view of our conclusion that the 1981 transfer of 1313 Como to Interfund, Inc., was a contribution to its capital, the subsequent transfer of the four units back to Campus Realty, Inc., must be treated as a distribution from Interfund, Inc., to petitioner. Respondent argues that although the transfer was made to Campus Realty, Inc., distributions of one corporation to another, both of which are wholly owned by the same shareholders, are distributions to the *495 shareholder. For this proposition, respondent cites Knipe v. Commissioner,356 F.2d 514 (3d Cir. 1966), affg. per curiam a Memorandum Opinion of this Court, and Helvering v. Gordon,87 F.2d 663 (8th Cir. 1937). Petitioner disputes neither respondent's authority nor his statement of the law. Petitioner argues that "Interfund, Inc., allowed another of petitioner's corporations to hold record title to the remaining four condominium units for the purpose of using it as a collateral for a loan it obtained for petitioner's benefit." This "mere fact," concludes petitioner, is no cause to deem the sale or distribution of those assets to petitioner. Although petitioner's argument hints of an agency relationship, petitioner does not support his statement of the facts with any reference to evidence before the Court and does not support his conclusion with any citations to authority. We are thus more persuaded by respondent's position, which has both factual and legal support. The transfer of the four condominium units must be treated as a distribution by Interfund, Inc. In addition to the distribution of the four condominium units, the total fair *496 market value of which was described in petitioner's Declaration of Condominium No. 247 as $ 233,000, respondent also identifies 1981 cash distributions to petitioner of $ 78,125.93 for the payment of petitioner's Guaranty note and $ 57,692.90 for cash paid petitioner at "closing." Petitioner does not dispute any of these amounts or that they were transferred. The proper treatment of distributions of a small business corporation is determined pursuant to sections 1371 et seq. and 301. Because the amount of income to Interfund, Inc., in 1981 from the sale of the nine condominium units exceeds the amount of cash distributions to petitioner, respondent contends that these distributions to petitioner are out of Interfund, Inc., current earnings and profits and taxable to petitioner as dividends under section 316(a)(2). Because distributions of property are not treated as distributions of previously taxed income, section 1.1375-4(b), Income Tax Regs., and because there *497 were no accumulated earnings and profits in Interfund, Inc., respondent contends that the distribution of the four condominium units to petitioner must be applied as a recovery of petitioner's basis under section 301(b)(2) and any excess must be treated as gain under section 301(b)(3). Respondent computes petitioner's basis in Interfund, Inc., as follows: Item
Amount
Capital Stock
$ 20,000 Prior Years Activity:
1971 Loss  (16,685)
1972 Gain  2,563 1973 Loss  (1,476)
Transfer of 1313 Como - Basis
[10] 163,251
Less Liability to Which
Property was Subject  (136,117)
$ 31,536 To this amount respondent would add the amount of gain on the sale of the condominium units of $ 285,791.09 less the cash distributions to petitioner of $ 135,818.83, resulting in petitioner's basis in Interfund, Inc., at the end of the taxable year of $ 181,508.26. As discussed earlier, the property distribution in the amount of $ 233,000 would be applied to this *498 basis, and the excess of $ 51,491.74 would be gain to petitioner. Respondent maintains that the character of the gain would be ordinary because Interfund, Inc., was a collapsible corporation under section 341(a). Petitioner does not dispute this characterization, and we agree with respondent's analysis. IV. Lawsuit Settlements and Legal Fees
A. Interest on Lawsuit Settlement - 1979
We must determine whether petitioner is entitled to an interest deduction in 1979 of $ 46,783 attributable to the settlement of a lawsuit by Midway. As noted by respondent, interest paid to the limited partners under the settlement agreed and paid to Midway under that settlement agreement was deducted by petitioner, was allowed by respondent, and is not in dispute here. Petitioner argues that the evidence establishes that Midway received a total of $ 205,000 in settlement of the action, that there was $ 157,155.72 of outstanding principal at the time of settlement, and that the difference of $ 47,844.28 constitutes deductible interest. Petitioner acknowledges, without explanation, that this amount is greater than the amount he claimed on his return, $ 46,783. In computing the total *499 amount paid to Midway upon settlement, $ 205,000, petitioner includes the $ 100,000 payment by the limited partners, the $ 55,000 to be paid by petitioner, and an alleged $ 50,000 payment by petitioner's brother, Dr. Raymond W. Scallen. Respondent advances three arguments: (1) that in the case of a lump sum settlement in compromise of a liability, where the agreement does not allocate part of the settlement to interest, no part of the settlement is interest; see Petit v. Commissioner,8 T.C. 228 (1947); (2) no part of the interest is deductible by petitioner because he, as well as each of the limited partners, was only a guarantor of the Midway note, on which the primary obligor was Interfund, Inc.; and (3) because petitioner individually was on the cash basis of accounting, he may only deduct interest actually paid in 1979.
Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." The indebtedness must be that of the taxpayer. Borchert v. United States,757 F.2d 209, 211 (8th Cir. 1985); Smith v. Commissioner,84 T.C. 889, 897 (1985), *500 affd. 805 F.2d 1073 (D.C. Cir. 1986). A guarantor is not entitled to deduct interest paid as a result of default by the debtor; such payments are attributable to guaranty agreements, not debt obligations. Smith v. Commissioner,84 T.C. at 898. In this case, petitioner made payments to Midway in respect of his personal guaranty of the Midway note and to the limited partners in respect of his assumption of their obligations to Midway as guarantors of the Midway note. The debtor, and hence primary obligor, on the Midway note was Interfund, Inc.; therefore, no interest deduction is allowed petitioner. We do not address the other arguments by respondent because the above analysis disposes of the issue.
B. Lawsuit Settlement: Limited Partners of CR-12 - 1980
We must determine whether petitioner is entitled to deduct $ 30,000 in 1980 for a lawsuit settlement involving the CR-12 partnership. Respondent contends that, based on the origin and character test, the deduction is capital in nature and that petitioner is entitled to deduct, as a long-term capital loss, only the amount actually paid in each year. Petitioner disputes both contentions. *501 To determine the proper tax treatment with respect to payments of a settlement liability, the origin and character test, sometimes referred to as the origin of the claim test, is the proper analysis. See Entwicklungs and Finanzierungs A. G. v. Commissioner,68 T.C. 749, 759 (1977), and cases cited therein. "If * * * the settlement payment was made to resolve a claim which arose in the process of acquisition of a capital asset or to extinguish a claim involving ownership rights to a capital asset, * * * it constitutes a capital expenditure." 68 T.C. at 759-760. In applying the origin of the claim test, we must consider "the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all the facts pertaining to the controversy." Boagni v. Commissioner,59 T.C. 708, 713 (1973). Applying the above criteria, we conclude that the origin of the claim giving rise to payments pursuant to the Settlement was not in the acquisition *502 or disposition of a capital asset in the hands of petitioner. Accordingly, we agree with petitioner that the item is properly deductible as a business expense. It appears from certain books and records of petitioner that the partnership CR-12 was liquidated in 1974 or 1975, that petitioner "assumed" control of the CR-12 property, and that he effected a sale of the property in 1977. Upon these events, it was petitioner's responsibility as sole general partner of CR-12 to manage the funds of the terminated partnership and to disburse to the limited partners their respective shares of capital contributions and profits. That petitioner acquired control of, and perhaps the ownership interest in, the CR-12 property should not confuse the analysis. It was petitioner's alleged failure to properly carry out his responsibilities as sole general managing partner, in liquidating the partnership, that was the "origin of the claim" to the litigation and subsequent settlement. The settlement liability therefore is not a capital expenditure giving rise to a capital loss deduction. Respondent also argues that the complaint and subsequent settlement involved petitioner only in his individual *503 capacity. Respondent thus maintains that any deduction must be on the cash basis. We disagree. Petitioner's involvement in the complaint and settlement was in his capacity as general manager of the partnership. Because petitioner reported the income and expenses of his property management business on the accrual method of accounting, he is entitled to the full deduction in 1980. Section 1.461-1(a)(3)(ii), Income Tax Regs.
C. Lawsuit Settlement: FKSI - 1980
We must determine whether petitioner is entitled to deduct $ 58,500 in 1980 for a lawsuit settlement involving FKSI. Respondent contends that, based on the origin and character test, the deduction is capital in nature and that petitioner is entitled to deduct, as a long-term capital loss, only the amount paid. Petitioner again disputes both contentions. Based on our consideration of all the facts and circumstances, we conclude that the "origin of the claim" was capital in nature. The kinds of transactions out of which the lawsuit arose were FKSI's sale of its interest in certain partnerships or ventures to petitioner and FKSI's construction of certain apartment buildings for petitioner. *504 None of the transactions involved petitioner's property management business. Because the transactions involved the sale or disposition of capital assets in petitioner's hands, the origin of the claim is capital and petitioner is entitled to capital loss treatment. We recognize that petitioner's deduction was claimed on Schedule C; however, petitioner has failed to establish any connection of the FKSI settlement to petitioner's property management business. Accordingly, petitioner is not entitled to claim the capital loss on the accrual method; instead, he may only claim amounts as they were actually paid. Pursuant to the schedule of payments described in the Settlement Agreement, petitioner would have paid a total of $ 13,000 in 1980. Although there is no documentation that the amounts were timely paid, there is also no indication that the terms of the Settlement Agreement were not complied with. Moreover, respondent does not argue that the amounts were not paid. We therefore conclude that petitioner may claim a capital loss deduction of $ 13,000 in 1980.
D. Legal Fees - 1979
We must determine whether petitioner is entitled to deduct legal fees in 1979. Petitioner *505 deducted legal fees of $ 40,727 on his 1979 tax return and now contends that he is entitled to a deduction in 1979 for legal fees of $ 39,267, comprised of the following: Rosen
$ 10,561.82
Primus
240.00
Brittany loan
3,472.00
Doctors' Settlement
24,994.00
$ 39,267.82
Petitioner offers no explanation as to why the amount is different from that reported on his tax return. Total billings to petitioner by Rosen and Primus in 1979 were $ 10,561.82 and $ 240, but there is no evidence of payments in 1979. Petitioner also has failed to substantiate payment of the $ 3,472 amount because his only evidence was the adjusting journal entries. Petitioner argues that a deduction for these amounts is nevertheless proper because the fees were reported on the accrual method of accounting and that the actual time of payment is not relevant. Petitioner contends that respondent is unfairly insisting that the legal fees be reported on the cash method while insisting that other items of income and deduction be reported on the accrual basis. Petitioner's property management business accounted for its income and expenses on the accrual basis while petitioner otherwise *506 accounted for income and expenses on the cash basis. Because petitioner failed to prove that they were attributable to his property management business, we conclude that respondent properly disallowed the deduction for these amounts in 1979. By virtue of their respective arguments, the parties have agreed that deductibility of the $ 24,994 amount is dependent upon our determination regarding the $ 30,000 lawsuit settlement with the limited partners of CR-12 in 1980. We determined, supra, that the origin of the claim involved in the lawsuit settlement with the limited partners of CR-12 was not in the acquisition or disposition of a capital asset and that the amount was attributable to petitioner's property management business. Accordingly, we conclude that the legal fees of $ 24,994 accrued in 1979 were not capital in nature, were attributable to petitioner's property management business, and therefore were properly deductible as an expense in 1979.
E. Legal Fees - 1980
We must determine whether petitioner is entitled to deduct legal fees in 1980. Petitioner now contends that he is entitled to deduct legal fees of $ 5,400.10; petitioner does not explain why *507 this amount is different from the amount claimed on his return, $ 7,314. In the alternative, petitioner argues that "if respondent insists that petitioner must account for legal expenses on the cash basis," he is entitled to a deduction of $ 10,050, the amount paid to Rosen in 1980. Respondent argues that the legal expenses were unrelated to petitioner's property management business, for which he reported items of income and expense on the accrual basis, and therefore may only be deducted on the cash basis. Respondent acknowledges petitioner's payments to Rosen in 1980 of $ 10,050 but argues that the same amounts were deducted in prior years, when the fees were incurred, and that therefore petitioner may not be allowed a double deduction. The evidence, however, does not establish duplicate deductions. We cannot deny a deduction simply on respondent's speculation that the item may have been deducted earlier. On the evidence available, we conclude that the legal fees for which the payments totaling $ 10,144.49 were made were not related to petitioner's property management business and must therefore be deducted on the cash basis. Respondent now argues that petitioner has *508 not established that the legal fees are allowable as ordinary deductions rather than as capital expenditures. Respondent suggests that the payments are attributable to fees incurred in prior years in the acquisition or disposition of various capital assets. Because of respondent's failure to identify evidence in support of his contention, a position not taken in the notice of deficiency and therefore one on which respondent bears the burden of proof, we conclude that the amounts paid may be deducted as ordinary expenses. See Rule 142(a). V. Gerald R. Hansen Deductions
A. Promotions - 1978
We must determine whether petitioner is entitled to deduct $ 5,000 for "Legal and professional services" and $ 22,000 for "Promotions" for amounts allegedly paid to Hansen in 1978.
Section 162(a)(1) allows a deduction for ordinary and necessary expenses paid as "a reasonable allowance for salaries or other compensation for personal services actually rendered." No deduction is allowed, however, if an expenditure otherwise deductible is a capital expenditure. Section 263. Capital *509 expenditures include those involving the cost of the acquisition or disposition of a capital asset. Woodward v. Commissioner,397 U.S. 572, 576 (1970); section 1.263(a)-1(a) and (e), Income Tax Regs.
Petitioner maintains that the expenditures are properly deductible as ordinary and necessary expenses in 1978. Respondent now contends that no deduction is allowable because the amount paid was not reasonable for the services allegedly performed. Alternatively, respondent maintains his position in the notice of deficiency that the expenditures were capital. Because respondent's first argument would increase petitioner's tax liability beyond the amount determined in the notice of deficiency and because it was raised in respondent's Answer, he bears the burden of proving the payments were unreasonable. Rule 142(a). He has not satisfied that burden. After considering all the facts and circumstances, we agree with respondent's determination that the expenditures should be capitalized. That the amounts were actually paid is not questioned. That petitioner and Hansen conducted their business relationship at arm's length is not disputed by respondent nor contrary *510 to any evidence of record. Petitioner testified that Hansen assisted him with obtaining sources of financing and with structuring sales and forms of refinancing. Hansen's testimony is consistent, suggesting that his primary assistance to petitioner in 1978 involved the Britanny property. The evidence does not, however, support allocation of the full amount to a particular property. Expenses paid in obtaining loan financing are capital expenditures to be amortized over the life of the loan. Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 275 (1979). Accordingly, petitioner's payments totaling $ 27,000 to Hansen in 1978 were capital expenditures that should be amortized as determined by respondent. B. Consulting Fees - 1978
We must determine whether petitioner is entitled to capitalize the "Consulting Fees" of $ 37,198 allegedly paid to Hansen in 1978. In his Answer to the petition, respondent contends that the amount was not ordinary and necessary, and respondent now argues that there was no transfer of property because petitioner never held an *511 interest in the St. Cloud property. Alternatively, respondent maintains his position in the notice of deficiency that the amount should be capitalized. Because respondent's first argument is a new matter raised in his Answer, he bears the burden of proving that there was no real transfer. Rule 142(a). Petitioner no longer seeks the current deduction but only seeks to have the amount capitalized and amortized. Upon examining the record, we agree with respondent's position that petitioner did not transfer anything to Hansen. Other than the adjusting journal entries, petitioner has produced no documentary evidence in support of the alleged transactions. Documents do exist, however, which show transfers of the St. Cloud property before and after the date of the adjusting journal entries but which do not involve petitioner or Hansen. Hamm testified that he never saw documentation and that he merely recorded the transaction, i.e., the adjusted journal entries, as instructed by petitioner. Moreover, Hansen's testimony describing payments from petitioner in 1978 included no mention of this alleged payment for "consulting fees." Based on this evidence, the petitioner's failure to *512 produce or identify conflicting evidence, we believe that respondent has met his burden of proof. None of the alleged consulting fee in 1978 may be deducted or capitalized.
C. Commissions - 1979
We must determine whether petitioner is entitled to deduct $ 25,000 for "Commissions" allegedly paid to Hansen in 1979. In support of the claimed deduction, petitioner relies on the recorded adjusting journal entry and the alleged incompleteness of "respondent's evidence." It is petitioner, however, who bears the burden of proving entitlement to the deduction, Rule 142(a), and the adjusting journal entry itself is insufficient, particularly in light of respondent's evidence to the contrary. A mere entry in the books and records does not establish the correctness of that entry or the allowability of a claimed deduction. See Northwestern States Portland Cement Co. v. Huston,126 F.2d 196, 199 (8th Cir. 1942). The records of Guaranty State Bank that were in the possession of the FDIC did not show any payments to Hansen on behalf of petitioner in 1979. Hansen, whose *513 testimony and notes identified and confirmed certain payments in 1978, could not recall, or identify in his notes, any receipts of income from petitioner in 1979. Although respondent requested proof of the payment in certain forms of formal discovery, no such verification was provided. We therefore sustain respondent's determination.
D. Consulting Fees - 1980
We must determine whether petitioner is entitled to deduct $ 25,000 for "Consulting Fees" allegedly paid to Hansen in 1980. Petitioner relies on the bank records as substantiation of the claimed deduction. Respondent argues, however, that the bank records show only that there was a disbursement and not that there was a payment for consulting fees. Further, respondent argues that in view of petitioner's testimony, Hansen's testimony, and Hansen's notes on his income in 1981, the amount simply could have been a loan from petitioner out of the proceeds from Guaranty State Bank. Hansen's notes and testimony suggest that he included a $ 15,000 payment in income in 1980 but not a $ 25,000 payment. Hansen and petitioner testified that they often made loans to each other. In view of these facts, and petitioner's *514 failure to prove the nature of the advance, assuming it was made, we conclude that no deduction may be allowed. Rule 142(a).
E. Commissions - 1980
We must determine whether petitioner is entitled to deduct $ 10,000 for "Commissions" allegedly paid to Hansen in 1980. Petitioner argues that certain checks establish the deduction he claims. Although the checks do confirm that Hansen received $ 10,000, their existence does not establish the nature or purpose of the payments. Hansen testified that he thought the payments could have been payments due him on the Brittany contract. In view of this testimony, which at the very least raises doubt as to the deductibility of the payments as commissions, and petitioner's failure otherwise to produce evidence of substance in support of the claimed deduction, it must be disallowed. Rule 142(a). VI. Other Determinations
A. Forgiveness of Liabilities - 1980
We must determine whether petitioner had income in 1980 from the forgiveness of liabilities. Respondent argues that petitioner has produced no evidence showing that he was obligated to pay the item or that there were any creditors asserting claims for the *515 item. Petitioner argues that the very fact that he sold Brittany does not mean the account payable is immediately due and is forgiven if not paid out of the sales proceeds. We do not disagree with petitioner's argument; however, it misses the point.
Section 61(a)(12) provides that gross income includes income from the discharge of indebtedness. The burden is upon petitioner to establish that respondent erred in his determination (1) that certain liability accounts in petitioner's books and records no longer reflect true liabilities and (2) that petitioner must therefore include a correlative adjustment in income. North American Coal Corp. v. Commissioner,32 B.T.A. 535, 543 (1935), affd. 97 F.2d 325 (6th Cir. 1938). See generally Carl T. Miller Trust v. Commissioner,76 T.C. 191 (1981). Petitioner's argument is merely speculative, and petitioner has otherwise failed to produce evidence showing error in respondent's determination. He has not met his burden of proof, and respondent's determination is therefore sustained.
B. *516 Forgiveness of Liabilities - 1981
We must determine whether petitioner had income in 1981 from the forgiveness of liabilities. Again, petitioner must prove error in respondent's determination. Petitioner disputes only the adjustment attributable to Anderson House of Furniture. Petitioner argues that "[t]he evidence establishes, however, that this account payable was never forgiven or compromised but rather paid on in the years following 1981." Petitioner's only "evidence" is his own self-serving testimony that, although Anderson House of Furniture had commenced certain lawsuits against petitioner, none of its accounts with petitioner were released, discounted, or compromised, except to extend the due dates. Respondent, however, notes certain adjusting journal entries in the 1975 books of Interfund/Jansco that tend to discredit petitioner's testimony. In view of the foregoing and petitioner's failure to produce or identify evidence in support of his allegation that the debt to Anderson House of Furniture was not forgiven, petitioner has not met his burden of proof, and we therefore sustain respondent's determination.
C. Teaching in France - 1981
We must *517 determine whether petitioner had additional income in 1981 from teaching at the University of Lyon of France. Petitioner concedes that the claimed employee business expenses are nondeductible but now argues that no amount of the $ 10,000 he received from the University of Minnesota and the University of Lyon, $ 4,500 of which was reported in income, is includible in income. Petitioner treats both the $ 6,000 payment from the University of Minnesota and the $ 4,000 payment from the University of Lyon as reimbursements and argues that no part of any reimbursement is includible in gross income if the related expenditures by the employee are made solely for the convenience and benefit of the employer. In support of his position, petitioner cites to Johnson v. Commissioner,32 T.C. 257 (1959), affd. 276 F.2d 110 (7th Cir. 1960); Kremer v. Commissioner,T.C. Memo. 1961-337; and Rev. Rul. 80-348, 1980-2 C.B. 31. Petitioner misstates the authority in Johnson, a case concerning the appropriate period of limitation to be applied to its particular facts. Instead, Johnson held that *518 only the balance or excess of the employer's reimbursements over the employee's expenses must be included in the employee's income. We have also reviewed the memorandum opinion and revenue ruling and conclude that they are distinguishable and do not lend support to petitioner's argument. The law in the area of employee business expenses and reimbursements is settled. In cases where the employee is required to account to the employer for such expenses, (1) if the reimbursements equal the ordinary and necessary business expenses paid or incurred by the employee, the employee need only include a statement to that effect in his return; (2) if the reimbursements exceed the expenses, the employee must include the excess in income and state on his return that he had done so; and (3) if the expenses exceed the reimbursements and the employee wishes to secure a deduction for such excess, the employee must include in his return a statement identifying the total reimbursements, the nature of his occupation, the number of days away from home, *519 and the total expenses broken down into broad categories. Section 1.162-17(b), Income Tax Regs. In cases where the employee is not required to account to the employer, the employee must include in his return a statement identifying the total reimbursements, the nature of his occupation, the number of days away from home, and the total expenses broken down into broad categories. Section 1.162-17(c), Income Tax Regs.
On the record before us, it is unclear whether petitioner was required to account to his employer for his employee business expenses; however, the result is the same under either subsection of the regulation. Petitioner was reimbursed a total of $ 10,000 for teaching at the University of Lyon and has conceded that he is not entitled to any employee business expenses. Because petitioner only reported $ 4,500 in income for teaching at the University of Lyon, he must include in income an additional $ 5,500.
D. Sunnyside, Inc.
We must determine whether petitioner is entitled to deduct losses in 1979 and 1980 attributable to Sunnyside, Inc., a small business corporation. The parties have agreed that, *520 if petitioner establishes basis in Sunnyside, Inc., the Sunnyside, Inc., losses in 1979 and 1980 are $ 12,705 and $ 21,005, respectively. Because petitioner was the sole shareholder of Sunnyside, Inc., during these years, any such losses, i.e., net operating losses, would pass directly to him. Section 1374. The parties also had agreed that if we determine that Sunnyside, Inc., is the owner of a certain apartment, Sunnyside unit #115 (unit 115), petitioner is entitled to an additional loss in 1980 of $ 8,401 relating to Sunnyside, Inc., to the extent of his basis therein.
Under section 1374(c)(2), a shareholder's portion of the small business corporation's net operating loss shall not exceed the sum of the adjusted basis of the shareholder's stock and the adjusted basis of any indebtedness of the corporation to the shareholder. Respondent argues that the application of section 1374(c)(2) would limit petitioner's 1979 and 1980 deduction for his share of the corporation's net operating loss in those years to zero. Respondent's final computation of petitioner's adjusted basis was as *521 follows: 1979 Basis
Item
Amount
Shareholder investment
$ 1,000.00 "Loans" from shareholder
134,538.00 Less portion of "loan"
account attributable to Interfund, Inc. (31,253.26)
Reversal of erroneous AJE
74,352.38 Reduced by loan of Sunny-
side, Inc., of mortgage proceeds on unit #115 (60,000.00)
Reduced by loan of Sunny-
side, Inc., for [11]Chesapeake, Inc.  (194,482.61)
Total    ($ 75,845.49)
or zero basis
1980 Basis
Item
Amount
Shareholder investment
$ 1,000.00 "Loans" from shareholder
207,430.96 Less portion of "loan"
account attributable to Interfund, Inc. (31,253.26)
Reversal of erroneous AJE
74,352.38 Reduced by loan of Sunny-
side, Inc., of mortgage proceeds of unit #115 (60,000.00)
Reduced by loan of Sunny-
side, Inc., for Chesapeake, Inc. (194,482.61)
Total     $ (2,952.53)
or zero basis
Of respondent's computations, petitioner only disputes the third item in each year, having assumed "arguendo" the correctness *522 of the other items. For the third item, the portion of loan account attributable to Interfund, Inc., respondent originally deducted $ 72,915.92 because that was the amount shown on the 1973 books of Interfund, Inc., as a debt to Interfund, Inc. As pointed out by petitioner, however, the amount was actually reflected on the books of Interfund, Inc., as Interfund, Inc.'s, liability to Sunnyside, Inc. Petitioner contends that the amount should thus be reversed and further contends that it should be added to his basis in Sunnyside, Inc. Petitioner argues that the debt was carried over to Interfund/Jansco, the proprietorship, from Interfund, Inc. In response, respondent now argues (1) that there is no evidence that any consideration was paid or received by Interfund, Inc., for the transfer of its assets and liabilities to the proprietorship and (2) that, in any event, he should have used the amounts in Interfund, Inc.'s, 1974 books, because that was the last year petitioner's property management business was operated through the corporation before being transferred to the proprietorship. The 1974 books show that Sunnyside,Inc., owed Interfund, Inc., a balance at the end of the year *523 of $ 31,253.26. After considering the available evidence and the arguments of each party, we conclude that petitioner has failed to establish any amount of adjustment basis under section 1374(c)(2). We are most persuaded by respondent's argument and final computation. The year-end trial balances of Sunnyside, Inc., show that the corporation continued its account "Due to/from Interfund" before and after petitioner's property management business was transferred from Interfund, Inc., the corporation, to Interfund/Jansco, the proprietorship. Because there is no evidence that consideration passed in that transfer, the balance of the account in the last year it represented loans from Interfund, Inc., was properly deducted from petitioner's basis by respondent. We also note that the balance sheet in the 1979 tax return of Sunnyside, Inc., reflects an ending balance of $ 134,538 in the loans from shareholders account and a beginning balance of zero. In such cases, we would consider past years such as 1973 and 1974 to be immaterial in that the ending balance in 1979 in the loans from shareholders account would have arisen from transfers or loans only in 1979. Petitioner has failed, *524 however, to produce evidence that conforms to the return filed or that explains why it differs from the trial balances in the record. We also are not convinced that petitioner had any basis in the stock of Sunnyside, Inc. Our search through the record revealed the following adjusting journal entry in Sunnyside, Inc.'s records for 1975: AJE #12
Due from S.B.S. (petitioner)
$ 1,000
Common Stock     $ 1,000
Moreover, each of the balance sheets filed by Sunnyside, Inc. with its tax returns maintains the $ 1,000 balance in each of these accounts. Because petitioner was the president and sole shareholder of Sunnyside, Inc., because petitioner has never paid off the "Due" account, and because petitioner has failed to demonstrate any intent to pay off the "Due" account, we conclude that he had no basis in the stock. Petitioner gave only a "promise to pay" in exchange for the common stock. Compare Nat Harrison Associates, Inc. v. Commissioner,42 T.C. 601, 624-625 (1964) (cash basis taxpayer denied a deduction for interest "paid" in the form of a note; the note represented only a promise to pay). Petitioner has failed *525 to establish any basis in Sunnyside, Inc., in 1979 and 1980 and thus may not deduct any losses for those years arising from Sunnyside, Inc. (Although there is no "remaining basis" against which petitioner may deduct additional losses, given petitioner's quitclaim deed in 1979 and Sunnyside, Inc.'s, mortgage on unit 115 (commencing in October 1979), Sunnyside, Inc., not petitioner, was the owner of unit 115 at the end of 1979.) VII. Fraud
We must determine whether petitioner is liable for fraud under section 6653(b) in each of the years in issue. For the years in issue, section 6653(b) imposes an addition to tax equal to 50 percent of the underpayment if any part of the underpayment is due to fraud. The addition attaches to the entire underpayment, even if only a portion of it is due to fraud. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), afg. 37 T.C. 703 (1962). Because of concessions by petitioner and because of our determinations on the other issues in this case, an underpayment of tax existed in each year in issue. We must *526 therefore determine whether any part of the underpayment in each year was due to fraud on the part of petitioner. The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Section 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. [12]Stoltzfus v. United States, 398 F.2s 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. A fraudulent underpayment of taxes may result from an overstatement of deductions as well as an understatement *527 of income. Hicks Co. v. Commissioner,56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner,52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent *528 intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971). Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). In this case, the record is replete with clear and convincing evidence of fraud in each of the years in issue. Petitioner intentionally devised a network of related and interrelated entities that obfuscated any tracing or investigation of questionable business practices by any interested party, including the government. Petitioner's activities thus provided a "cushion" against the payment of any Federal income taxes during the years in issue. For the reasons discussed below, we conclude from the specific activities and overall conduct of petitioner throughout the years in issue that respondent has satisfied his burden of proof. In Spies v. United States,317 U.S. 492, 499 (1943), the Supreme Court identified certain badges of fraud as follows: By way of illustration, and not by way of limitation, we would think affirmative willful attempts may be inferred from conduct such as keeping a double set of books, making *529 false entries or alternations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * * [Emphasis supplied.] The failure to maintain complete and accurate records is an indicium of fraud. Grosshandler v. Commissioner,75 T.C. 1, 20 (1980), and cases cited therein. Petitioner's books and records were wholly deficient in reflecting the deductions and other transactions claimed by petitioner and his various businesses. Present in those records, and often the only written support for many deductions and transactions, were the adjusting journal entries made by petitioner's accountant Hamm according to petitioner's instructions. Although Hamm often requested documentation to support the adjusting journal entries, he was rarely provided with any. In spite of respondent's formal discovery requests, documentation was not produced to *530 respondent or during trial. In view of petitioner's professional background, he certainly was aware of the importance of adequate records, but he failed to maintain them. Petitioner's conduct thus indicates that he was "handling * * * [his] affairs to avoid making records usual in transactions of the kind," Spies v. United States, supra, to an extent demonstrating fraudulent intent.
"In determining presence or absence of fraud the trier of facts must consider * * * the training and experience of the party charged." Iley v. Commissioner,19 T.C. 631, 635 (1952). See Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984), affg. a Memorandum Opinion of this Court. Petitioner's knowledge of tax law is exceptional, and his teaching experience shows that he maintained an ongoing foundation in the basic principles of Federal income taxation and was abreast of any current developments in the area. Petitioner's experience afforded him the opportunity to carefully structure sophisticated real estate transactions and to meticulously *531 organize the books and records relating to both his business and his personal affairs. Instead, petitioner's transactions and his books and records are difficult to understand and nearly impossible to trace. Moreover, these problems are compounded by petitioner's use of so many names and entities, particularly where one name refers to both a corporation and a proprietorship. We do not believe or accept petitioner's assertions that the underpayments of his taxes were attributable to errors by Hamm. The failure by a taxpayer to make available complete and accurate records to the person charged with the responsibility of preparing the taxpayer's returns may, in the view of the courts, reflect an intent on the taxpayer's part to conceal and deceive. In Estate of Temple v. Commissioner,67 T.C. 143, 162 (1976), the Court upheld the imposition of the fraud addition and stated: While a taxpayer's reliance upon his accountant to prepare accurate returns may indicate an absence *532 of fraudulent intent, this is true in the first instance only if the accountant has been supplied with all the information necessary to prepare the returns. * * * [Citations omitted.]
See also Foster v. Commissioner,391 F.2d 727 (4th Cir. 1968), affg. a Memorandum Opinion of this Court. Many of the omissions and mischaracterizations on petitioner's tax returns were too substantial to be "overlooked" by petitioner.
Although an understatement of income standing alone is not sufficient to prove fraud,a pattern of consistent and substantial understatements of income is strong evidence of fraud. Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Based on our determinations, petitioner consistently understated income by substantial amounts in each year in issue. Regardless of our determinations, however, petitioner admitted to the following understatements of income: 1973
$ 100,000  Income for services
1974
5,249  Interest income
1975
46,500  Interest income
1978
58,695  Gains on sale/exchange
1981
11,165  Various items
*533 Petitioner's understatements of income are strong proof of fraud.
The carryforward of amounts based on fraud from one year to another supports the addition to tax for fraud in each affected year. [13] Petitioner claimed a deduction for a NOL carryforward in each year in issue. Respondent reduced the amount of the carryforward in 1976 by almost $ 650,000, and petitioner no longer disputes respondent's adjustments. Built into petitioner's NOL were (1) consistent understatements of income in 1973, 1974, and 1975, (2) bad debt deductions for accounts that, according to petitioner's books and records, were not worthless when claimed, (3) a loss deduction on the sale of certain real property derived from the use of a "FMV limitation" where the amount of the FMV claimed by the petitioner, and not supported by independent appraisal, was substantially less than the amount he otherwise believed to be correct, and (4) the reduction of petitioner's 1975 Schedule C gross receipts by an amount that should have been reported as an expense by a separate entity. In 1977, petitioner reported a long-term *534 capital loss deduction in which he again used a FMV amount, not supported by independent appraisal, that was substantially less than the amount he otherwise believed to be correct. The capital loss was also carried forward through 1981. We are convinced that the items described above were fraudulently claimed by the petitioner and that deductions claimed by petitioner in subsequent years based on the carryforward of such items constitute fraud in each carryforward year. Based on all of the above, we conclude that petitioner exhibited conduct constituting the willful attempt to evade taxes in each year in issue. Accordingly, we sustain the imposition of the 50-percent addition to tax for fraud against petitioner in each of those years. Decision will be entered under Rule 155.
APPENDIX
Respondent's
Petitioner's
Issue
Opening Brief Issue
Answering Brief Issue
1 10
1 2 11
2 3 20
8 4 29
14
5 42
20
6 31
16
7 40
21
8 41
22
9 19
7 10
26
12
11
27
13
12
17
6 13
32
17
14
14
3 15
15
4 16
16
5 17
24
10
18
30
15
19
25
11
20
36
19
21
35
18
22
21
9 23
44
23
24
--
--
*535 May 20, 1988 ORDER
This case was tried in St. Paul, Minnesota, on June 20, 23, and 24, 1986; the Court's opinion was filed August 24, 1987, as T.C. Memo. 1987-412. Petitioners' Motion for Reconsideration was filed September 24, 1987, and granted in part by order dated November 3, 1987. Petitioners' Motion to Correct Mathematical Error, directed at the order of November 3, 1987, was filed November 10, 1987. Respondent's Response to Petitioners' Motion to Correct Mathematical Error was filed November 16, 1987. In a conference call on November 23, 1987, the Court suggested that the parties attempt to negotiate their differences over petitioners' pending motion but acknowledged that the order of November 3, 1987, was partially in error. On January 11, 1988, respondent filed a Status Report, reporting with respect to the negotiations of the parties over petitioners' Motion to Correct Mathematical Error. As of that time, the record showed only a single dispute remaining with respect to the computations for decision, namely petitioners' correct adjusted basis in the property known as Brittany as of October 1980. The parties were unable to reach agreement, and *536 respondent's Computations for Entry of Decision were filed March 16, 1988, along with Respondent's Second Response to Petitioners' Motion to Correct Mathematical Error. On March 28, 1988, petitioners' Computation for Entry of Decision, petitioners' Objection to respondent's computation for entry of decision and proposed decision, petitioners' Memorandum of Law in Support of Objection, Memorandum of Law in Support of Motion for Leave to File a Motion to Amend the Motion to Correct Mathematical Error and in Support of Motion to Amend Petitioners' Motion to Correct Mathematical Error, Memorandum in Support of Petitioners' Motion for Leave to File and Petitioners' Motion to Amend Petition to Elect Income Averaging, Motion for Leave to File a Motion to Amend the Motion to Correct Mathematical Error, Motion for Leave to File a Motion to Amend the Petition were filed and their Motion to Amend Petition, Motion to Amend Petitioners' Motion to Correct Mathematical Error, and a proposed Amendment to Petition were lodged. By the foregoing documents, petitioners raised, for the first time and 21 months after trial, a claim that they were entitled to compute their tax for certain of the years *537 in issue by income averaging. They also changed their position with respect to the recomputation of adjusted basis in Brittany property. The dispute over computations was set for hearing in Chicago, Illinois, on April 13, 1988. At that time Respondent's Objection to Petitioners' Motion for Leave to File a Motion to Amend the Petition, Objection to Motion for Leave to File a Motion to Amend the Motion to Correct Mathematical Error, and Memorandum in Support of Respondent's Objection to Petitioner's Motion for Leave to File and Petitioners' Motion to Amend Petition to Elect Income Averaging were filed. Petitioners' Motion for Leave to File a Motion to Amend the Petition and the Motion for Leave to File a Motion to Amend the Motion to Correct Mathematical Error were granted. Petitioners' Motion to Amend Petitioners' Motion to Correct Mathematical Error was also granted, with the understanding that, as a minimum, the errors in the Court's order of November 3, 1987, would be corrected. Petitioners' Motion to Amend the Petition was taken under advisement. Upon due consideration of the entire record in this case, and for reasons more fully appearing in respondent's Objection to Petitioners' *538 Motion for Leave to File a Motion to Amend the Petition and Memorandum in Support of Respondent's Objection to Petitioners' Motion for Leave to File and Petitioners' Motion to Amend Petition to Elect Income Averaging, and in the transcript of proceedings of April 13, 1988, it is hereby ORDERED: That the portion of the Court's order of November 3, 1987, set forth in the second ordered paragraph at the bottom of page 1 and the top of page 2 of said order, consisting of subparagraph "(1)" is vacated and set aside. It is further ORDERED: That the Court's Memorandum Findings of Fact and Opinion (T.C. Memo. 1987-412) filed August 24, 1987, is amended by striking therefrom the two full paragraphs beginning at page 58 with the words "Petitioner argues" and "The parties to" and the first full paragraph on page 59 beginning with the words "An adjustment." It is further ORDERED: That petitioners' basis in Brittany as of October 1980 shall be determined as set forth in Schedule No. 3 of respondent's Computations filed March 16, 1988, because the Court determines that respondent's said computations correctly reflect the evidence in the record in this case. It is further ORDERED: That *539 petitioners' Motion to Amend Petition filed April 13, 1988, is denied, because the Court determines that the belated claim for income averaging is untimely and prejudicial to respondent and cannot be decided on the present record. See Lewis v. Commissioner, 90 T.C. (filed May 19, 1988). It is further ORDERED: That decision shall be entered in accordance with respondent's computation filed March 16, 1988. Mary Ann Cohen
Footnotes
1. Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All references to rules are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on $ 442,840. ↩
*. 50 percent of the interest due on $ 442,840.↩
2. The Court ordered seriatim briefs in this case, with respondent going first. The Court expressly stated: "Some of the items seem clear but the amounts are trivial, so it will take very careful analysis of the record by both parties before I know what result I'm reaching in this case." Respondent dedicated 125 pages to 644 proposed findings and, on 2 pages, asserted only 23 proposed findings. All of petitioners' proposed findings were conclusory statements of the issues he addressed, one conclusion per issue. None of the petitioners' proposed findings, and only a few of his objections to respondent's proposed findings, contained citations to evidence in the record. See Rule 151(e)(3). Each of petitioners' arguments, except with respect to fraud, consisted generally of one-half to two pages of conclusory statements, occasional citations to the record, and rare citations to or analysis of applicable legal authority for petitioners' position. Petitioners' brief was totally unhelpful. See Stringer v. Commissioner,84 T.C. 693, 705 (1985), affd. without published opinion 789 F.2d 917↩ (4th Cir. 1986). *. In June 1974, petitioner acquired the assets of CR-4 and the interests of the other partners by assuming all of the partnership liabilities. In December 1974, petitioner acquired the assets of Cedar Courts, Ltd. Partnership and CR-5 and the interests of the other partners by assuming all of the partnerships' liabilities. In 1974 or 1975, petitioner acquired control of the assets of CR-12.↩
3. The record is confusing in that certain documents identify petitioner's property management business as Jansco or Interfund or Interfund/Jansco; moreover, the terms are easily confused with petitioner's corporations bearing the same name, i.e., Interfund, Inc., and Jansco, Inc.↩
4. Specifically, on August 18, 1976, Mutual Benefit filed two complaints with the District Court of the State of Minnesota: one sought judgment against Franklin Park Partnership, petitioner, and other related parties for $ 800,000, the difference between the amount of the mortgage and the asserted value of the property; the other sought judgment against petitioner for his personal guarantee of the Eberhardt note, such guarantee having been assigned to Mutual Benefit. On September 22, 1978, mutual releases and Stipulations of Dismissal with Prejudice were executed by the parties in both actions. ↩
5. The total of the percentages is actually 100.09%. ↩
6. The sum of these amounts is actually $ 27,369.96. ↩
7. The FMV limitation was based on the following language in footnote 37 of Crane v. Commissioner,331 U.S. 1 n. 37 (1947): Obviously, if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage. * * * ↩
8. Respondent is thus seeking to deny petitioner a stepped-up basis for when the property was subsequently sold to Charter Jet in 1980. ↩
9. Not unlike certain other matters in dispute, including the Brittany transactions, each party identifies the issue and frames his respective argument in a manner indicating, without specifically stating, that certain forms of the transactions under consideration are being ignored. Regarding this issue, respondent and petitioner state that petitioner↩ transferred 1313 Como to Interfund, Inc. In his tax returns, petitioner apparently treated the property as his, by reporting items of income and expense relating to the property on Schedules E. The documents in evidence, however, do not identify petitioner as the transferor of 1313 Como to Interfund, Inc., but rather Campus Realty, Inc. Also, during the same period petitioner was reporting the property's activity in his return, mortgages on the property were executed by Campus Realty, Inc. Other than petitioner's testimony that he did not consider Campus Realty, Inc., to be a separate taxable entity, neither party has argued or identified evidence that an agency relationship existed between Campus Reality, Inc., and petitioner. The issue as to who actually owned the property before it was transferred to Interfund, Inc., is not raised by the parties, and we will therefore limit our analysis to the matter in dispute, i.e., whether the transfer was a sale or a contribution to capital. 10. We have substituted the amount of the carryover basis as determined in the previous discussion. Respondent did not account for the 1980 contribution to capital of $ 18,503.↩
11. Sunnyside, Inc., apparently paid Chesapeake, Inc., on a note held by Interfund/Jansco. ↩
12. Petitioner would interpose a requirement of "substantial evidence of egregious misconduct before imposing the civil fraud penalty." The cases cited by petitioner do not establish such a requirement. See, e.g., Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958); Ferguson v. Commissioner,14 T.C. 846, 849↩ (1950). 13. See Technical Industrial Consultants, Inc. v. Commissioner,T.C. Memo. 1966-150. Compare Adcock v. Commissioner,T.C. Memo. 1982-206↩.